[No. 28529.   Department One.   February 20, 1942.]

EDLA HILL *et al., Appellants,* v. E. R. PARKER *et al., Respondents.*[1]

[1]Reported in 122 P. (2d) 476.

518

*Teresa I. Masters* and *Oscar A. Zabel,* for appellants.

*Stevenson & Gershon,* for respondents.

DRIVER, J.—In the two causes of action of their complaint, the plaintiffs alleged, respectively: First, that the defendants, who operated a dental office in Seattle, falsely represented to plaintiff wife that all her upper teeth were unsound and should be extracted, thus inducing her to consent to have them removed, although she had requested some bridge work and a partial plate; and, second, that one of the defendants,

as an employee and agent of the others, extracted Mrs. Hill's upper teeth, and negligently and carelessly used infected, unsterilized instruments, applied excessive force, fractured and broke through the bony process surrounding the teeth and separating them from the antrum, and permitted the antrum to become infected. Defendants answered, denying all the material allegations of the complaint.

At the trial, which was to a jury, when plaintiffs rested their case, defendants' counsel moved "for dismissal of the action on the ground that there is no evidence whatever to go to the jury." The court granted the motion, and, after denying plaintiffs' motion for a new trial, entered judgment, dismissing the action with prejudice. Plaintiffs appeal. For the sake of convenience, we shall hereinafter refer to Mrs. Hill as though she were the only appellant.

▮ Broadly stated, the question presented is whether the evidence was legally sufficient to make a case for the jury. At the outset, we call attention to the rule so firmly established as to require no citation of authority: that a challenge to the sufficiency of the evidence admits the truth of the plaintiff's evidence and all inferences that can be reasonably drawn therefrom, and requires that the evidence be interpreted in the light most favorable to the plaintiff.

▮ It will serve to limit to some extent our review of the evidence to observe that there was a manifest failure of proof as to appellant's first cause of action. Appellant had only five upper teeth left when she went to respondents for treatment, and she then had pyorrhea in her teeth and gums. Her own dental expert testified that it was out of the question to build bridgework on her remaining upper teeth, and that whether or not such teeth should have been extracted was a question of judgment or opinion, which depended

not only upon the X-ray pictures available to him, but also upon the clinical examination made by the attending dentist at the time of the latter's diagnosis. There was, therefore, no substantial evidence of the falsity of the representations alleged in the first cause of action.

With reference to the second cause of action, appellant adduced no evidence at all that, in attending her, respondents had used infected or unsterilized instruments. Appellant's counsel tacitly concede these failures of proof, as they state in their opening brief that appellant "seeks damages for injury due to the negligence of the defendants in the manner of extraction of her teeth, and the failure to properly treat the wound left by the negligent extraction." The evidence having a material bearing on these two claimed grounds of negligence may be summarized as follows:

In August, 1938, appellant went to respondents' dental office in Seattle, and there respondent Wilson examined and took X-ray pictures of her teeth. He first referred her to an assistant, not a party to the present action, who extracted two lowers and then sent her to respondent Charlebois, who took out all her remaining teeth, two lowers and five uppers, about August 23rd. Referring to the removal of the upper teeth, appellant testified:

"And he done like (illustrating by jerking fist in an outward and upward direction from her mouth). He don't bother to go like this (pulling fist in downward direction from her mouth); he turned it like this (again jerking fist in an outward and upward direction from her mouth). . . . Q. Now explain what happened when the right teeth were pulled. A. As soon as these two teeth come out I felt air go in my nose. And I put my hands like that and I say, I say, 'Doctor, you broke my jawbone.' And he laughed. And after that he put his thumb in my mouth, like that. (illustrating) Then he pulled out his thumb, and he

stopped and he say, 'And I give you good work.' And that is terrible pain right away, and air come in my nose. . . . "

A nurse gave her some Anacin tablets, and she went home, but the pain continued, and the next morning she went back to respondents' office for relief. She was given more tablets and lysol and hot water to hold in her mouth. On the third day, Dr. Charlebois "put stitches in, a couple of stitches." On the fifth day, some doctor in respondents' office put her "mouth asleep" with "an anaesthetic" and "open up again that hole, that big hole, and pulled some kind of piece of bone out." A day or so later, respondent Wilson told her he could not do anything for her and would have to send her to a specialist. He directed her to a Dr. Rion in the Cobb building.

Appellant still suffered severe and continuous pain, which she described as being on the right side, "up here and in my ear and up in my head here and here" (indicating). She visited Dr. Rion's office every other day for about two weeks, and he put oil of cloves in her mouth and "cotton in that hole," and one morning "something bad tasting come into my mouth. It was terrible." Dr. Rion referred her to a Dr. Clark, who examined her nose and mouth and put some medicine in her nose. She then consulted a Dr. Copps, who sent her to Dr. Wanamaker. The latter started treating her about September 17th. He "opened my nose up and oh, is it stinking. And the pain came down right away." She stated that she continued to take treatments from Dr. Wanamaker twice a week for almost a year.

Appellant, who was fifty-nine years of age, had had no pain or antrum trouble on either side of her face and no trouble with her teeth on the right side before they were extracted by respondent Charlebois.

Appellant's husband was with his wife on the occasion of the last extraction, but he had remained in the waiting room during the operation. He testified that appellant cried and exclaimed: "Look. My jaw is broken. I am in a bad fix; my jaw is broken; they broke the bone."

A doctor of dental surgery of Seattle, called by appellant as an expert witness, testified:

"Q. Doctor Vandewall, if a tooth is extracted, —say the first and second molar, right upper teeth, and at the time of the extraction the patient states, 'He has broken my jaw,' and the air shoots through the nostril, what would that indicate? A. That would indicate an opening into the antrum. Q. It would indicate an opening into the antrum? A. Yes. Q. From the extraction of the tooth? A. Yes sir."

Appellant's counsel then asked the witness this question:

"In the extraction of teeth, if a practitioner pulls the first and second upper molars in a violent fashion and in an upward and outward direction, and extracts the tooth in that manner is that the method usually practiced by dentists in this community?"

An objection was interposed, the question was not answered and the examination proceeded as follows, omitting objections which were overruled and the comments of counsel and of the court:

"Q. What is likely to happen from such a method of extraction? . . . A. Well, it would be more likely to fracture the processes around the roots, because of either fracture, or trauma, to the tissues. . . . Q. If in fact, Doctor, a patient underwent an extraction of that nature and subsequently felt the air come through the nose, and evinced great pain in the upper right jaw, in your opinion would that be caused by the fracture of the maxillary area and the teeth? . . . A. *That would indicate that, yes, that there was an opening made between the tooth socket and the antrum.*" (Italics ours.)

The witness then stated that good dental practice requires that such an opening be closed "as soon as possible" to keep infection from getting into the antrum from the mouth. He was shown an X-ray picture of appellant's upper right jaw, showing the first and second molars, taken in respondents' dental office about three days before the last extraction; and, after examining it, stated that he did not see anything wrong with the antrum, and that he did not think there was an abscess in the area. He then continued:

"Q. Now I will ask you, Doctor, as to what is the practice in this community, ordinary practice of dentists in the extraction of teeth, in the physical manner in which they are removed? A. You mean how a tooth is extracted? Q. Yes. A. Well, I think the principle of the operation is to spring the tooth, without any breaking of the bone, and enlarge the socket to some extent, so the tooth can be sprung out of the socket. The idea is to spring it with a lateral motion, and then pull in the line of least resistance, like pulling a nail, —*you would give it a lateral motion, and then downward, if it is an upper tooth.*" (Italics ours.)

On cross-examination, Dr. Vandewall testified:

"Q. If a tooth were taken out in the fashion actually described to you, the first thing that would happen would be that the root would snap off. A. Not necessarily. That would depend on the shape of the roots and what the movement was. But you would be apt to break the root or the process. Q. But usually the roots give? A. That depends on the bony process, —whether it is weak or strong. Q. Did you ever, in all your life, hear of a case, and would it be possible for a man taking out a whole molar by extraction, to push that molar tooth up into the antrum; did you ever hear of that? A. No, I never heard of pushing the whole tooth. *I have heard of pushing the roots, but not a tooth.* . . . Q. Would it be possible, in extracting a whole molar tooth, to force that root or force one root of that tooth, with three roots coming out, —would it be possible to force that tooth up and into the antrum? A. No.

I don't think it would be possible to force the tooth up into the antrum; *but it would not be necessary to force them into the antrum to make an opening, because the bone might be thin, and in pulling the root out you may do that."* (Italics ours.)

Appellant called as a witness Dr. Wanamaker, the Seattle ear, nose, and throat and oral surgery specialist who treated her for the antrum trouble. Her counsel confined his interrogation to the condition which the witness had found and to the treatment administered. On cross-examination, respondents' counsel undertook to go into the matter of respondents' negligence, but an objection was made and sustained on the ground that it was not proper cross-examination. Respondents' counsel then requested permission to make Dr. Wanamaker their own witness, which permission the court granted, and counsel proceeded with his examination. Thereafter, each of the two opposing counsel reexamined the witness two additional times.

■■ Appellant contends that we should not consider that portion of Dr. Wanamaker's testimony which was given as a witness for respondents. On the other hand, respondents take the position that we should consider all the testimony. In principle, we think appellant's contention is sound. Respondents' motion to dismiss was directed against appellant's evidence only, and they were not entitled to support it with a part of their own case which the trial court had permitted them to introduce out of order. In an action tried to the court with a jury, a challenge to the sufficiency of the evidence should be made either at the close of the plaintiff's case or after *all* the evidence has been presented, including any rebuttal which the plaintiff may have introduced. See Rem. Rev. Stat., § 410-1 [P. C. § 8122-2].

However, as a practical matter, it is difficult and, to a considerable extent, impossible to determine, as to

his various reexaminations, when Dr. Wanamaker was testifying as a witness for appellant and when he was testifying as a witness for respondents. We shall therefore consider all of the testimony of the witness and, it should be noted; our doing so will not change the result of this opinion. Like all the other evidence in the case, it must, of course, be considered in the light most favorable to appellant; and, if, in some respects, it is unfavorable to her, she is not bound by the unfavorable portion (*Lindberg v. Steele*, 5 Wn. (2d) 54, 56, 104 P. (2d) 940, and cases therein cited), at least in so far as it does not, in some fundamental way, absolutely negative her right of recovery.

Dr. Wanamaker testified that appellant came to him for treatment on September 17, 1938, and he found that:

"There was considerable pus and in the right upper processes the jaw was red and infected and was tender to the touch. There was spicules of bone protruding through the gums. There was about two teaspoonfuls of pus, foul-smelling pus, obtained. Q. How was that obtained? A. Through the bone to the wall to the sinus, and break through and force a solution through there."

The witness stated that he again washed out appellant's sinus on September 19th and found "foreign substance" in that area, and that the treatment was repeated by him or by his associates seven additional times between that date and October 14th, when he found the sinus clear; that appellant thereafter complained of pain in her right cheek, and he saw her a number of times, gave her some shots of vitamin B-1 in June, 1939, and last examined her in August of that year. He expressed the opinion that the pain of which appellant still complained at that time could have been from neuralgia brought on by the sinus infection.

On examination by respondents' counsel, Dr. Wana-

maker first stated that there was no difference between appellant's antrum case and hundreds of others treated by him in which no tooth extraction had been involved, and then testified:

"Q. . . . What would the extraction of a tooth, so far as your examination is concerned, have to do with the diseased condition of the antrum? A. The starting-up is already there. Q. Then this other infection must have been present at the time the tooth was extracted? A. Yes sir."

The witness further stated that the antrum is an opening "in the side of the jaw, on both sides," approximately above the bicuspids and molars; that sometimes the tooth roots, which are housed in callous bone, "protrude into the floor or through the lower floor of the antrum"; and, upon being asked whether, in extracting "a whole molar tooth," it would be possible "to push that tooth" through the lower wall of the antrum, answered that he did not think it could be, and that he had never seen such a case, and:

"I noticed you said that, when you went to drain this sinus, you went up through the nose. A. Yes. Q. It didn't drain down into the mouth, did it? A. No, there was no pus going into the mouth. Q. Was there any opening, in the antrum, going into the mouth? A. *Not when I saw her.* Q. It was intact? A. There was no water or pus forcing through. Q. And no hole? A. None that I could locate *at that time.*" (Italics ours.)

Appellant's counsel again interrogated the witness, in part, as follows:

"Q. I will ask you, Doctor: There are cases when a tooth is extracted and the maxillary wall is broken, causing an opening into the antrum, with foreign substance getting into the antrum and causing infection? A. It could, sure. Q. It could? A. Yes. MR. STEVENSON: Just a moment. We ask that it be stricken. He has assumed something directly to the contrary of the

doctor's testimony. The doctor has testified that there was no opening in the lower wall of this lady's antrum. Mr. ZABEL: There is evidence to that. Mr. STEVENSON: There is no particle of evidence of that. THE COURT: Sustain the objection. Q. Dr. Wanamaker, when a tooth is extracted and, at the time, the patient feels air through the nose, would that be an indication that the antrum was open? A. Yes sir. Q. Now— A. That is a suction you refer to? Q. Yes, through the opening in the maxillary wall, and it carries on through the nose? A. Yes. . . .

"THE WITNESS: May I explain that? THE COURT: Yes. THE WITNESS: I testified that, at the time I saw her, there was no opening I could find. They asked me: At the time a tooth is extracted, and if the patient feels air go through into the sinus, would I say there was an opening in the antrum. And I say, 'Yes.' . . .

"Q. *In other words, Doctor, if a hole was placed into the antrum, from the extraction of the tooth at the time, sometime later that could heal over, could it not?* A. *Yes sir.* . . . Q. Dr. Wanamaker, I believe you diagnosed the case that she was suffering from acute right maxillary sinusitis due to the extraction of her upper molar teeth. A. No. Q. I will ask you if this is your signature. (Handing) A. Yes sir, that is my signature. . . .

"Q. In this letter you said, 'She is suffering from acute right maxillary sinusitis, due to the extraction of her upper molar teeth.' Is that correct? A. That is correct. Q. And that is what you really feel in this case? A. Yes, that it came from the tooth,—that the infection came from one of the teeth there. THE COURT: I am not quite clear on that. Q. (The Court) Did it come from the teeth, or extraction of the teeth? A. Well, if there is an extraction. The infection has put the pus on the tooth, and just the fact of removing the tooth will start up this infection, which may cause a sinus infection. That is what I meant there. . . .

"(The Court) If that infection obtains, that result may follow, whether the extraction is properly done or improperly done? A. It may follow, yes, whether properly done or improperly done. Q. (The Court)

So the fact that infection follows: Is it or is it not evidence of improper dentistry? A. It is not evidence. Q. Dr. Wanamaker, if the antrum is pierced, and previous to this extraction the patient had no difficulty, and an infection then followed after extraction, then it would be evidence, wouldn't it? A. It would be evidence that they had broken through into the sinus in one respect: We have the roots of the tooth that protrude into the floor of the sinus, and removal of the tooth will let the air through. Q. *But there are instances where the bone can be fractured to the extent that the antrum is opened from the extraction?* A. *Yes; because the antrum is tissue-paper thin."* (Italics ours.)

The witness also testified that the type of infection which he found in appellant's antrum was one which he would classify as coming from infected teeth; that he did not know whether or not the spicules, or splinters of bone, which he had taken from the appellant's tooth socket came from the floor of the antrum; and that appellant had acute or recent right maxillary sinusitis, which might have developed after the extraction of her teeth.

▋ The rules governing the duty and liability of a dentist to his patient correspond to the rules applicable to physicians and surgeons generally. 21 R. C. L. 386, § 31; annotation, 129 A. L. R. 101, par. II, supplementing annotation in 69 A. L. R. 1143. Our own cases which have been called to our attention do not explicitly enunciate this principle, but they uniformly tacitly recognize it. Paraphrasing the well-settled rule applicable to physicians and surgeons, then, it may be said that a dentist is bound to bestow upon his patient that degree of care, skill, and diligence which dentists in his line of practice in the same general neighborhood or in similar localities ordinarily exercise in like cases. *Wharton v. Warner,* 75 Wash. 470, 135 Pac. 235; *Hollis v. Ahlquist,* 142 Wash. 33, 251 Pac. 871; *Peterson v.*

*Hunt,* 197 Wash. 255, 84 P. (2d) 999; 48 C. J. 1113, § 101; 21 R. C. L. 381, § 27.

Usually, the plaintiff in a malpractice action must, by expert testimony, establish the applicable standard of care, skill, and diligence, and show that the defendant has in some way departed therefrom. The reason for the requirement is that, ordinarily, such matters involve technical medical knowledge beyond the ken of the laymen. *Dishman v. Northern Pac. Beneficial Ass'n,* 96 Wash. 182, 164 Pac. 943; *Brear v. Sweet,* 155 Wash. 474, 284 Pac. 803; 48 C. J. 1150, § 157-c. There are exceptions, however, and this court has many times held that a malpractice case may be proved without the aid of expert testimony by a chain of circumstances from which an ordinary layman may reasonably and naturally infer the ultimate fact required to be established. *Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626; *Cornwell v. Sleicher,* 119 Wash. 573, 205 Pac. 1059; *Jordan v. Skinner,* 187 Wash. 617, 60 P. (2d) 697; *Gross v. Partlow,* 190 Wash. 489, 68 P. (2d) 1034; *Peterson v. Hunt,* 197 Wash. 255, 84 P. (2d) 999, *supra; Atkins v. Clein,* 3 Wn. (2d) 168, 100 P. (2d) 1, 104 P. (2d) 489.

Bearing in mind the foregoing principles, has appellant established the two grounds of negligence on which she now relies, namely, that the respondents were negligent in the method of extraction of her teeth, and that they failed to give her proper care and treatment following the extraction? We shall consider these two grounds of negligence in inverse order.

Appellant's sole dental expert testified that, when an extraction resulted in the opening of a passage from the tooth socket to the antrum, good practice requires that it be closed as soon as possible. There was no explanation or elaboration of either the expression "closed" or "as soon as possible." If, by the

former, he meant the suturing of the gum from which the teeth had been removed, that was done by respondents on the third day after the operation. Whether or not three days was "as soon as possible" under the circumstances, the expert testimony does not indicate. Moreover, it was not shown that respondent Charlebois knew of the opening into the antrum or that, in the exercise of the requisite care and skill, he should have discovered it. Appellant's expert witness was able to draw the conclusion that the antrum had been opened by the extraction, it is true, but, in doing so, he assumed that, when the teeth were pulled, appellant experienced great pain in her upper right jaw and *felt air rush into her nose,* presumably through the tooth socket and antrum. There is no evidence in the record that appellant ever told Dr. Charlebois or any of the other respondents about feeling the air rush into her nose. There is no means of determining, without resort to conjecture, whether or not, in the absence of such information, respondents were negligent in failing to discover the opening. We think there was a failure of proof of negligence in respondents' postoperative care and treatment of appellant.

Passing to the sole remaining question: Is there substantial evidence or reasonable inference from the evidence from which the jury could have found that respondents were negligent in extracting appellant's teeth, and that such negligence proximately caused her antrum to become infected?

Clearly, according to the testimony of appellant's expert, Dr. Vandewall, the manner in which appellant's upper molar teeth were extracted, as she described it, by *jerking* them *outward* and *upward,* instead of *pulling* them *downward,* as one would to pull a nail, in the line of least resistance, was not proper or in accordance with ordinary dental practice in Seattle.

From the manner in which the extraction affected her, Dr. Vandewall concluded that it had resulted in breaking an opening into her antrum by fracturing the bony process about the tooth roots. It may reasonably be inferred from his testimony that the existence of an opening increased the likelihood and the danger of infection entering the antrum from the mouth.

To supplement this expert testimony, we have the circumstances detailed by appellant, that she had had no antrum trouble before the extraction; that the extraction made her feel as though her jaw had been broken and immediately caused her severe pain in the right side of her face and head, which was not relieved until Dr. Wanamaker opened and cleaned out the antrum; that, following the extraction, there was also an immediate, noticeable suction of air from her mouth through the tooth socket and antrum into her nose; and, finally, we have the testimony of Dr. Wanamaker that, when she came to him about twenty-five days after the extraction, she was suffering from an acute or recent infection of the antrum, and he removed spicules, or splinters of bone, from one of her empty upper tooth sockets, which he conceded might have come from the floor of the antrum.

This is not a case where experts disagree as to whether the method employed conformed to standard practice. Dr. Wanamaker expressed no opinion regarding the manner in which appellant stated her teeth were extracted, and there is nothing in his testimony to overcome, as a matter of law, the inference which a jury could reasonably have drawn from the stated circumstances that the infection in appellant's antrum proximately resulted from the negligent extraction. Dr. Wanamaker stated that he found no opening in appellant's antrum from her mouth, but he carefully guarded his answers to questions on that subject so

as to express the thought that no opening was apparent *at the time he examined her.* As stated, his first examination was twenty-five days after the last extraction, and he admitted that, if a hole had been opened into the antrum by the extraction of a tooth, it could have healed over "some time later." It seems to have been his opinion that appellant's teeth were infected, and that their removal stirred up, or lighted up, such infection, thereby affecting her antrum; but it is not clear that his opinion would have been the same had he assumed, as the jury could have found, that the extraction was negligently performed and had resulted in breaking open a passageway from appellant's mouth to her antrum.

*Helland v. Bridenstine,* 55 Wash. 470, 104 Pac. 626, *supra,* was a malpractice action against a physician and surgeon. The defendant had examined plaintiff's genital organs, and, in so doing, used certain nickel-plated instruments, which, she testified, he kept wrapped in a towel in a drawer and used without first cleaning or sterilizing them. In five to ten days, she developed an infection which was subsequently identified as gonorrhea. Defendant claimed that he had sterilized the instruments, but he also testified that he kept them on top of a cabinet in his office; that he had not used them for five days prior to plaintiff's examination; and that at night the temperature in his office, which was heated only in the day time, went down to 50° to 55° Fahrenheit.

Several medical experts testified for the defendant that the gonococcus germ could not survive in temperatures so low as 50° to 55° for any considerable time, certainly not so long as four or five days, on a nickel-plated instrument. This court held that the circumstances were sufficient to warrant submission of the

case to a jury. The following excerpt from the opinion, p. 475, is pertinent here:

"There was here, we think, sufficient evidence on the questions of the appellant's negligence, whether the respondent had actually become infected with gonorrhea, and whether the disease was communicated to her by means of the instruments the appellant had used upon her person, to require their submission to the jury. The respondent was not required to prove her case beyond a reasonable doubt, nor by direct and positive evidence. It was only necessary that she show a chain of circumstances from which the ultimate fact required to be established is reasonably and naturally inferable. If it be true (and whether or not it is true was for the jury) that the respondent went to the appellant's office free from gonorrhea; that the appellant introduced into her vagina a speculum, which he used on other patients, without cleansing or sterilizing it, and that within the time thereafter usual for such a disease to generate, she became afflicted with the disease, and there was no other known source of infection, it is a reasonable inference that she caught the disease from the instrument used upon her by the appellant, and that the disease was negligently communicated to her. Nor is the inference so far overcome by the evidence of the expert witnesses as to require the court to take the question from the jury. None of them purported to testify how long the microbe gonococcus would live on a speculum which was wrapped in a towel and placed in a drawer in the temperature of the appellant's office, and the court is not at liberty to assume that their evidence related to such a condition. Moreover, the opinions of experts are taken to aid the jury in arriving at the ultimate fact, and no matter how positive may be their conclusions drawn from a given state of facts, it is still a question for the jury whether or not the facts recited on which the conclusion is based are the facts proven by the evidence, and whether or not the conclusion is correctly drawn."

The foregoing excerpt, down to the last two sentences, was quoted with approval in *Jordan v. Skinner,*

187 Wash. 617, 60 P. (2d) 697. There, in a suit against a physician for malpractice, based upon his failure to put a prophylactic solution into the eyes of an infant at birth, as required by the regulations of the state health department, it was held that, in the absence of expert testimony, the circumstances were sufficient to warrant submission to the jury of the question whether an infection, which had appeared in the baby's eyes several days after birth, was gonorrheal infection.

On the instant appeal, we think the testimony of appellant's expert witness and the circumstantial evidence considered together were sufficient to make a jury case. In so far as it pertains to the first cause of action, the judgment of dismissal of the superior court is affirmed. As to the second cause of action, the judgment is reversed, and the cause is remanded, with direction to grant appellant's motion for a new trial.

ROBINSON, C. J., MAIN, MILLARD, and STEINERT, JJ., concur.