[No. 38070. En Banc. October 20, 1966.]

BARBARA E. PETERSON, *Respondent,* v. OSCAR BERNARD ERITSLAND *et al., Appellants.*\*

\*Reported in 419 P.2d 332.

*Jennings P. Felix,* for appellants.

*Johnson, Jonson & Inslee,* by *Evan E. Inslee,* for respondent.

HAMILTON, J.—Plaintiff (respondent) initiated this action against defendants (appellants), husband and wife, to enforce two contracts for the support of two illegitimate children. The trial court sustained the contracts and ordered payments in accord therewith. Defendants appeal. We affirm the judgment of the trial court.

In September, 1957, appellant Oscar Bernard Eritsland, a medical doctor, arrived in Seattle, Washington, to commence residency in a local hospital and establish a practice. His wife, appellant Amelia E. Eritsland, was to and did join him in the early part of October. In the interval, he met respondent, a nurse, and the two commenced an extramarital affair which lasted well into 1962 and resulted in the birth of two children, one in October, 1958, and the second in April, 1962.

In the midpart of 1958, the doctor opened his own office, and, in early 1959, employed respondent as his office nurse. His practice flourished; however, he became addicted first to barbiturates and then to narcotics. His addiction in turn led to serious medical board disciplinary action and the discontinuance of his private practice in 1962.

On April 7, 1961, and on June 27, 1962, respectively, the doctor and respondent went to an attorney's office and executed comprehensive agreements with respect to the two children. In executing the agreements, the doctor purported to act on behalf of his marital community, although his wife was not, until sometime later, fully cognizant of the extent of the agreements. By these agreements, the doctor acknowledged paternity and respondent agreed to forego filiation proceedings, provided appellants did not default. In addition, the agreements make varying provisions relative to custody, visitation, education, guardianship,

adoption, heirship, insurance, tax benefits, and a sliding and arbitrable scale of support payments pegged to the needs of the respective children and the income of the doctor.

Shortly after execution of the first agreement, in April, 1961, the doctor's wife became aware of the existence of the first child, and she became aware of the second child within a month after its birth in April, 1962. Thereafter, she wrote some 14 checks in partial payment of the children's support, as called for by the agreements, and joined the doctor in amending their 1961 joint income tax return to allow a deduction for the support of the first child and in claiming both children as dependents upon their 1962 and 1963 income tax returns. After January, 1964, appellants refused to make further payments.

On the heels of appellants' default, respondent initiated this action seeking specific performance, and at about the same time caused a filiation proceeding to be initiated with respect to the second child (the pertinent 2-year statute of limitations having long since run as to the first child).[1] The filiation proceeding has been held in abeyance pending determination of this action.

In her complaint, respondent, in essence, alleged the agreements, appellants' default, and prayed for enforcement. By way of answer, appellants, in substance, admitted the doctor's execution of the agreements, denied their efficacy, and affirmatively alleged duress, lack of consideration, fraud, and estoppel.

Upon the dispositive issues as framed by the pleadings and the evidence, the trial court, from the substantial though conflicting testimony adduced at trial, found and concluded that (a) the doctor was the putative father of the two children; (b) he executed both agreements voluntarily, competently, and for a valuable consideration; (c) appellant wife ratified both agreements; and (d) appellants

---

[1] "No prosecution under this chapter shall be brought after two years from the birth of the child: *Provided,* The time during which any person accused shall be absent from the state shall not be computed." RCW 26.24.160.

defaulted. The trial court thereupon entered judgment decreeing enforcement of the agreements.

On appeal appellants make 12 assignments of error, 11 of which are directed to specific findings of fact entered by the trial court. Essentially, appellants' assignments reduce themselves to three principal contentions: (1) The agreements are void for lack or failure of consideration; (2) the agreements are unenforceable against appellants' marital community; and (3) the doctor's drug addiction rendered him incompetent to execute the agreements.

We must disagree with each of appellants' contentions.

■ The making of a contract between the mother of an illegitimate child and the putative father, for the support and benefit of the child, is not offensive to public policy. Instead, such a course of action is in accord with the policy of our statutory law, which, contrary to common law, makes provision, through filiation proceedings, for fixing the paternal responsibility and duty of support in such cases. RCW 26.24. See, Annot. 39 A.L.R. 444, 159 A.L.R. 1509, and text material in 10 Am. Jur. 2d *Bastards* §§ 70, 71 (1963), and 10 C.J.S. *Bastards* § 19 (1938).

In the instant case, appellants' contention that the respective contracts lack or fail of consideration is predicated upon the assertion or assumption that the only consideration which would support either contract is respondent's agreement to forego bringing a filiation proceeding. This, however, is neither the law nor the fact.

■ It is true that, in most instances, the only consideration recited for execution of an agreement by a putative father is forbearance on the part of the mother from maintaining a filiation suit. However, such forbearance is not the only consideration which will support such an agreement. Generally speaking, any provision or obligation for or to the child, the mother or the putative father beyond bare legal care and maintenance is legally sufficient to sustain the contract. The adequacy of the consideration is a matter to be determined by the parties. *Schumm v. Berg,* 37 Cal. 2d 174, 231, P.2d 39, 21 A.L.R. 2d 1051 (1951); *Beattie v. Traynor,* 114 Vt. 238, 42 A.2d 435, 159 A.L.R. 1399 (1945);

*Ippolito v. Terragni,* 140 Misc. 606, 251 N.Y. Supp. 374 (1931); *Rosseau v. Rouss,* 91 App. Div. 230, 86 N.Y. Supp. 497 (1904).

In the instant case, as already indicated, the contracts are comprehensive. They respectively contain mutual and reciprocating provisions relative to the contracting parties' rights and duties with regard to the children's custody, visitation, residence, adoption, education, heirship, and support. The obligations accepted and imposed by the agreements exceed in a variety of ways those obligations or responsibilities which would arise out of a filiation action. In this latter vein it is to be noted that RCW 26.24.090 provides only that the judgment in a filiation proceeding shall charge the putative father "to pay a sum to be therein specified . . . until such child shall have reached the age of sixteen years," whereas, the instant contractual provisions purport to carry forward, even should the putative father die, until the respective children reach 21 years of age or are otherwise sooner emancipated. Appellants' argument overlooks and ignores these added and substantial covenants, benefits, and detriments. Accordingly, we conclude, as did the trial court, that neither contract lacks valid consideration.

Appellants' second contention concerns enforceability of the agreements against the marital community. In this respect, appellants assert a lack of consideration running to the community and also attack the trial court's finding that the appellant wife ratified both contracts.

It would be malapropos to say that the doctor's affair with respondent was carried on for the benefit of appellants' marital community. The affair was legally and morally wrong as well as a grievous insult to the doctor's marital vows. This, however, is not the issue. The issue is whether the agreements executed by the doctor for the support of the two innocent children are binding upon appellants' marital community.

In resolving the issue as thus limited, we need not enter into a discussion of the propriety, nature, or sufficiency of the benefit, if any, flowing to the marital community from

the agreements, for the trial court essentially premised its judgment against the marital community upon its finding that appellant wife ratified the agreements. Thus, assuming no benefit running to the community from the agreements in the traditional sense, two questions present themselves (a) may a wife render the marital community liable by ratifying her husband's agreements to support his illegitimate children, and (b) do the facts in this case support the trial court's finding of ratification.

We think both questions must be answered in the affirmative.

■ We have recognized that a wife may ratify her husband's unauthorized transactions, provided she "have full knowledge of all the facts and a reasonable opportunity to repudiate the transaction; and the retention of benefits after acquiring knowledge of the facts does not amount to a ratification if at that time conditions are such, without the fault of the wife, that she cannot be placed in statu quo, or cannot repudiate the entire transaction without loss.'" *Geohegan v. Dever,* 30 Wn.2d 877, 898, 194 P.2d 397 (1948); *Whiting v. Johnson,* 64 Wn.2d 135, 390 P.2d 985 (1964).

We see no public policy reason which would dictate the application of a different rule in situations involving a husband's support agreements of the nature here involved. Admittedly, some wives would be unwilling to ratify such agreements. However, this should not preclude a wife who, moved by sympathy for the unfortunate children or by a genuine desire to preserve her marriage, would be agreeable to affirming and sanctioning such support arrangements. We, accordingly, hold that the doctrine of ratification can apply, and that a marital community can become bound thereby.

Coming then to the second question, we are satisfied the evidence amply supports the trial court's finding of ratification. In this respect, the evidence, while not entirely undisputed, fairly demonstrates that appellant wife (a) knew of the doctor's affair with respondent early in 1961, (b) knew of the birth of each child shortly after each event, (c) knew that the doctor was in communication with

an attorney and that pursuant to some form of agreement commenced making support payments following the birth of each child, (d) participated with the doctor in claiming the children as dependents on joint income tax returns for the years 1961, 1962, and 1963, (e) wrote and remitted the checks for support during the year 1963 after consulting with an attorney and being advised as to the nature and status of the agreements, and (f) did not repudiate the agreements until January, 1964.

Based upon these facts, the trial court's finding of ratification was warranted.

By their third contention, appellants assert the trial court erred in determining that the doctor was mentally competent to execute the agreements. This assertion is predicated upon evidence bearing upon the doctor's misadventure with drugs.

The mental competency or capacity of an individual to execute an agreement, when challenged, presents a factual issue to be determined by the trier of the fact, with the test being whether the person in question, at the time of executing the contract, possessed sufficient mind or reason to enable him to understand the nature, the terms and the effect of the transaction. *Page v. Prudential Life Ins. Co. of America,* 12 Wn.2d 101, 120 P.2d 527 (1942); *Harris v. Rivard,* 64 Wn.2d 173, 390 P.2d 1004 (1964). This is true whether the questioned mental condition be the product of disease, age, alcohol, or drugs. 17 C.J.S. *Contracts* § 133(1) (1963).

The evidence in the instant case, though conflicting, supports the trial court's finding upon this issue. Accordingly, we will not disturb the finding. *Harris v. Rivard, supra.* Furthermore, the evidence clearly demonstrates that the doctor, after being cured of his affliction, affirmed his agreements by continuing to make or provide for the support payments until January, 1964.

We find no merit in appellants' peripheral contentions of duress, undue influence, fraud, or estoppel.

The judgment is affirmed.

All Concur.