[No. 40030.    En Banc.    February 19, 1970.]

THE STATE OF WASHINGTON, *Respondent*, v. JUNIOR COFFEY, *Appellant*.*

*Reported in 465 P.2d 665.

*MacDonald, Hoague & Bayless* and *Stephan R. Feldman,* for appellant.

*Charles O. Carroll, Jeremy R. Randolph,* and *Clay Nixon,* for respondent.

NEILL, J.—This appeal primarily concerns the jurisdiction of the courts to modify a child support order in a filiation proceeding.

In 1965, after hearing under RCW 26.24, defendant was adjudged to be the father of an illegitimate child and ordered to pay $100 a month child support. In 1967, the mother of the child filed a petition in the filiation proceeding seeking an order increasing the support payments. She alleged changed conditions as to the child's health and medical needs, her diminished ability to furnish support, and the defendant's increased ability to furnish support.

The defendant immediately challenged the jurisdiction of the court and the right of the mother to petition for modification. Then, the prosecuting attorney joined in the petition. These challenges were rejected and the matter proceeded to trial. Finding a substantial change in conditions, the trial court ordered the child support payments increased to $165 a month. Defendant appeals.

Error is assigned to (1) the ruling that joinder by the prosecuting attorney cured any lack of standing on the part of the mother and (2) the ruling that the courts have jurisdiction to modify child support orders in filiation.

The first assignment of error has little merit. Even if we were to assume that the state is the only party with standing to prosecute filiation matters, we agree with the trial court that pretrial joinder by the prosecuting attorney would cure any defect. To require dismissal in such circum-

stances, only to have the prosecuting attorney refile the petition, would involve the courts in useless repetition.

Defendant's second assignment of error challenges the jurisdiction of our courts to modify filiation child support orders. This challenge has two basic thrusts:

Defendant first argues that, since our filiation statute (RCW 26.24) does not explicitly provide for modification of child support orders, jurisdiction to do so does not exist because (1) filiation proceedings are entirely statutory in nature and, thus, statutes are the sole source of the courts' jurisdiction; (2) other states have adopted the uniform illegitimacy act, the uniform paternity act, or other statutes containing express provision for modification, which indicates that only the legislature can give such power to modify; and (3) reference to our divorce statutes (which contain express provision for modification of child support decrees) shows that such jurisdiction does not exist absent statutory authorization.

Defendant's second argument is that, even if there would have been an inherent power in the courts to modify such orders, the wording and the legislative history of our filiation statute evidence a legislative intent to foreclose such jurisdiction in paternity actions in that: (1) The filiation statute uses the term "order and judgment" when referring to the filiation decree, but uses only the word "judgment" when referring to proceedings on defaulted installments. Thus, when the legislature provided for modification of a "judgment" in RCW 26.24.150, it was referring only to default judgments and demonstrates its intent to restrict modification authority to default proceedings. *Expressio unius est exclusio alterius.* (2) The original bastardy statute (Code of 1881, § 1214 to § 1221) contained an express provision (§ 1221) for modification of the support decree. Thus, the absence of such a provision in the current (1921) act shows legislative intent to remove the modification power.

In analyzing defendant's first principal contention, we agree with his suggestion that the area of divorce jurisdic-

tion is analogous and should be consulted. Prior to 1921, our divorce statutes did not contain any specific authorization to modify decrees relating to alimony and child support. By Laws of 1921, ch. 109 § 2, there was added the provision:

[W]hich order shall also make all necessary provisions as to alimony, costs, care, custody, support and education of children and custody, management and division of property, which order as to the custody, management and division of property shall be final and conclusive upon the parties subject only to the right of appeal; . . .

Then, by Laws of 1933, ch. 112, the power to modify child support decrees was expressly stated.

If defendant's contention is correct, the legislative history of our divorce statutes would indicate that prior to 1933 (or possibly 1921) courts could not modify a child maintenance order once entered. Nonetheless, it had become established during that time that the courts had an inherent and continuing equitable jurisdiction where the welfare of minor children was involved, which existed independent of statutory authorization.

For example, in *Poland v. Poland,* 63 Wash. 597, 600, 116 P. 2 (1911), we observed:

The jurisdiction of the court in divorce cases, where alimony is awarded for the support of children, is a continuing one, and the jurisdiction of both the parties and the subject-matter continues so long as there is a minor child whose welfare and maintenance are provided for in the decree.

*Accord, Dyer v. Dyer,* 65 Wash. 535, 118 P. 634 (1911); *Harris v. Harris,* 71 Wash. 307, 128 P. 673 (1912). In *Dyer,* at 537, we further noted that "These matters, from their very nature, invoke the equitable powers of the court, and the jurisdiction is a continuing one . . ."

In *Ruge v. Ruge,* 97 Wash. 51, 55, 165 P. 1063 (1917), wherein we held that the particular alimony decree where no children were involved was not subject to modification, we discussed the difference between the case before the

court and one in which there were minor children under the protection of the court:

[T]he courts of all the states are at one upon the proposition that, so far as the decree of alimony is for the benefit of the minor children of the spouses, the power to modify the decree continues so long as there are minor children under the protection of the court. . . . The right of the wife to alimony arises immediately out of the marriage contract, but the right of the child to support at the hands of its parents springs from the incidental relationship which had its origin in marriage, to wit, that of parent and child. The court, therefore, acting upon this relationship as one of the things brought to it by the divorce action, has the power to modify or alter its decree so long as there are minor children under the protection of the court.

Then, in *Cross v. Cross*, 98 Wash. 651, 168 P. 168 (1917), we reiterated the power of courts to modify an alimony decree in a case wherein children were involved and the decree provided that the payments were for "support of herself and her children." This independent power to modify appears to have become imbedded as law of the state by the time of *Holter v. Holter,* 108 Wash. 519, 185 P. 598 (1919).

Finally, in *State ex rel. Ranken v. Superior Court,* 6 Wn.2d 90, 94, 106 P.2d 1082 (1940), we noted that, even though the earlier statutes contained no express provision for modification of divorce decrees,

Nevertheless, during the time that the statute was in force, this court repeatedly held that, under its equitable powers, the court had continuing jurisdiction in divorce cases to modify the decree, *so long as there was a minor child, or children, whose maintenance and welfare was provided for in the decree.*

■ There was a time in the history of Anglo-Saxon jurisprudence when an illegitimate child was a total outcast, without a right to support from either its mother or father. In later common law, the duty of the support of such a child was entirely upon the mother. Now, almost universally, the father is given a share of this responsibility

by statute. In keeping with this enlightened change of concept as to the status and rights of an illegitimate child, we are not disposed to treat the illegitimate child so differently from the legitimate child caught in the backwash of his parents' separation. In all sense of justice and equity, any such distinction, at least as to the right of parental support, belongs to a bygone day. That our courts are not confined to such antiquity is evident from the statutory and case history of child support decrees in the analogous field of divorce.

As the preceding discussion has shown, developments in the divorce area contradict defendant's first set of arguments against the jurisdiction of the trial court. The mere absence of explicit statutory provision for child support modification does not foreclose the courts from updating support orders to reflect changing realities. Such continuing jurisdiction inheres in the equitable powers of the courts wherever, by common law or statute, the power to order such child support exists.

The question remains whether the wording or history of RCW 26.24 negates the inherent jurisdiction to modify child support orders in filiation proceedings. On this point, the gist of defendant's argument is that the explicit provision in RCW 26.24.150 for modification of "judgments," meaning default judgments, shows a legislative intent to exclude any power to modify child support "orders." The answer to this argument is provided by the legislative definitions of these terms: RCW 4.56.010—"A *judgment* is the *final* determination of the rights of the parties in the action." (Italics ours.) RCW 4.56.020—"Every direction of a court or judge, made or entered in writing, *not included in a judgment,* is denominated an *order.*" (Italics ours.)

It is understandable that the legislature would consider it necessary to explicitly state the authority to modify particular judgments. But this fact has no relevance whatsoever to "orders." Indeed, as the above definition connotes, the opposite is true when "orders" are involved. Orders by their nature are not final, and to make them so an express legis-

lative declaration would be necessary. No such declaration is to be found in the filiation statute. To the contrary, RCW 26.24.090 gives separate designation to the "judgment" of paternity and the "order" for child support payments. Accordingly, defendant's first argument fails.

The next argument of defendant is that the legislative history of the filiation statute shows an intent to delete any power to modify child support orders. He cites *Alexander v. Highfill,* 18 Wn.2d 733, 140 P.2d 277 (1943), and other cases, for the proposition that where a statute is amended or reenacted in different language, it will be presumed that the language was intentionally changed. As a general proposition, that is an accepted rule. The presumption is reasonable when viewing legislative action wherein the legislature has changed language that was before it in existing statutes. However, we have before us a different and unusual situation.

■ Washington's original bastardy statute was enacted as part of the Code of 1881 (Code of 1881, § 1212 to § 1221). That act contained an express provision permitting modification of the support decree. In 1903, *State v. Tieman,* 32 Wash. 294, 73 P. 375 (1903), this court held the act unconstitutional. A search of the compilation of laws of the state discloses that in 1905 the 1881 act was dropped from the code of laws with the notation that it had been held unconstitutional. Pierce's Code § 1839 (1905). Thereafter, the act completely disappears from the compilations of statutes. Between 1903 and 1919, there were no filiation or bastardy statutes in the state. When the legislature enacted Laws of 1919, ch. 203, p. 709, now RCW 26.24, it created an entirely new and complete filiation act. No reference was made to the 1881 act and understandably so—it had been "out of the books" for 14 years. The legislature was neither amending nor reviving an existing act. Under these circumstances, we will not indulge in the presumption that the legislature intended to change any particular part of the 1881 act.

■ Our conclusion in this case is strengthened by reference to the legislature's underlying purpose in enacting

filiation statutes. We do not quarrel with the principles of statutory construction cited by defendant in support of his arguments. Rather, we point out that rules for construction of statutes are tools of necessity which courts use in their efforts to discern legislative intent. Overriding all technical rules of statutory construction must be the rule of reason upholding the obvious purpose that the legislature was attempting to achieve. We have pointed this out in several of our cases. *E.g.*, in *Lenci v. Seattle*, 63 Wn.2d 664, 671, 388 P.2d 926 (1964), we quoted *In re Horse Heaven Irr. Dist.*, 11 Wn.2d 218, 226, 118 P.2d 972 (1941):

> "It is a rule of such universal application as to need no citation of sustaining authority that no construction should be given to a statute which leads to gross injustice or absurdity."

Again, in *Alderwood Water Dist. v. Pope & Talbot, Inc.*, 62 Wn.2d 319, 321, 382 P.2d 639 (1963), we reiterated an ancient adage of law that the spirit or purpose of legislation should guide interpretation of the phraseology and cited *Eyston v. Studd* (England, 1574), 2 Plowden 460, 464:

> ". . . intent of statutes is more to be regarded and pursued than the precise letter of them, for oftentimes things, which are within the words of statutes, are out of the purview of them, which purview extends no further than the intent of the makers of the act, and the best way to construe an act of Parliament is according to the intent rather than according to the words. . . ."

In light of these principles, we take note of the obvious intention of the legislature—to provide for paternal support of illegitimate children. This type of legislation is for the benefit of the child, not the parents, and must be viewed and construed in light of the changed concept of the position of an illegitimate child in our society. In so reading the 1921 act, it is our view that the legislature did not intend that a filiation order entered prior, at, or within 2 years of the time of the child's birth was to be frozen for from 14 to 16 years and that courts could not consider, during that time, changes in the child's needs or the condition of the parents' ability to meet those changing requirements. Fur-

ther, the act itself evidences an intent that the courts have a continuing jurisdiction over the subject matter. Otherwise, there would be no provision for subsequent hearings regarding default in payments or failure to post bond. RCW 26.24.110-.150.

We hold that the court has jurisdiction to modify a filiation support decree upon proper showing of a change of circumstances as to the child's requirements, the mother's ability to furnish support, and the father's ability to respond to the requirements of his child. We are satisfied that such a construction of these statutes accords with our rules of proper construction and is in keeping with the intention of the legislature to effect a meaningful and equitable filiation act.

Judgment affirmed.

HUNTER, C. J., FINLEY, WEAVER, ROSELLINI, HAMILTON, and HALE, JJ., concur.

DONWORTH, J.† (dissenting)—I cannot agree either with the result of the majority opinion or with the reasons stated therein for affirming the trial court's order in this filiation proceeding.

In my opinion, the trial court had no jurisdiction to increase the amount of child support which the father had been ordered to pay until the child reached the age of 16 years. This conclusion is based on two grounds: (1) that under RCW 26.24.110, *et seq.,* the legislature has not authorized any such increase, and (2) that under the separation of powers provision of our constitution only the legislature has power to grant authority to the courts to order such increase.

With respect to the first ground, the majority refers to the history of our divorce statutes and points out that during the period prior to 1933 (when the existing statutes contained no express provision for changing orders in divorce proceedings relating to child support), this court re-

---

†Justice Donworth is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).

peatedly held that under its equity powers the trial court had continuing jurisdiction to modify the decree during the minority of the child. *See State ex rel. Ranken v. Superior Court,* 6 Wn.2d 90, 106 P.2d 1082 (1940), and cases cited therein.

The majority then refers to the plight of an illegitimate child in a filiation proceeding and holds that such a child should be treated in the same manner with respect to its support as the child of parents who have been divorced.

Parenthetically, this statement of the majority, as to the pitiable condition of illegitimate children whose parents are involved in a filiation proceeding, should constitute a persuasive argument to the legislature (which is now in session) that the filiation statute should be changed in the respects pointed out therein.

A case directly in point is *Whittlesey v. Seattle,* 94 Wash. 645, 163 P. 193 (1917), which involved our wrongful death statute and (like our filiation statute) created a cause of action which did not exist at common law. In 1917 the legislature amended the wrongful death statute to provide a cause of action for surviving children for the wrongful death of their mother. Prior to the *Whittlesey* decision, *supra,* our statute gave children *no* cause of action for the wrongful death of their mother. It was so held in that case. The decision was filed February 16, 1917, and the legislature enacted a new statute relating to wrongful death actions which was signed by the Governor on March 14, 1917, thus curing the then existing injustice. If the filiation statute is to be changed authorizing the court to increase the amount of the child support payments entered under the original order and judgment, only the legislature may establish such right in an illegitimate child by appropriate legislation. The courts have no inherent and continuing equitable jurisdiction to change the amounts awarded in filiation proceedings which were created solely by the legislature.

Resuming consideration of the alleged analogy between a child involved in a filiation proceeding and one whose par-

ents have been divorced, I think that the two proceedings are entirely antithetical. Divorce, of course, can only be instituted by one of two parties to a marriage, which is a contractual relationship entered into by their mutual consent. When they have children they are obligated to support them both before and after the divorce. As stated in the *Ranken* case, *supra,* this court relied on the amendatory statutes and not the equity powers of the trial court. This court said at 94-95:

> It is to be noted that, in those decisions, this court did not go to the length of saying that the decree might be modified in all cases where there were minor children, regardless of whether or not they had been provided for in the original decree, but merely held that, so long as there was a minor child, or children, whose welfare and maintenance had been provided for in the decree, the court had continuing jurisdiction to modify such decree. Relator now contends that those cases settled the law to the effect that the presence in the original decree of some provision for the maintenance and welfare of a minor child or children is an essential prerequisite to jurisdiction to modify the decree in those respects. We concede that there is much force in relator's argument. On the other hand, it should be pointed out that, in the cases above cited, the facts did not require the court to go any further than it did.

> If our former cases on the subject, taken as a whole, particularly those to which reference has already been made, were our only guide to a pronouncement of a definite rule in such matters, we would be inclined to hold that, while the court, under its equity powers, has continuing jurisdiction in divorce cases to modify its decrees with respect to the custody and support of the minor children of the parties, the exercise of such power is nevertheless limited to those instances where the original decree had made some provision for custody or support, but that, where no such provision had been made, relief could be had only in an independent action. Those former cases, however, do not constitute our only guide to a determination of the rule applicable to the instant situation. In 1921 and 1933, amendments which bear directly on the issues before us were incorporated into the earlier divorce statute, quoted above.

The parties to a filiation proceeding are in quite a different category from that of divorced parents. The rights of the mother, the child, and putative father are entirely statutory and did not exist at common law. As provided in RCW 26.24.010, the proceeding may be instituted only by an unmarried woman (or her parent or guardian) by the filing of a complaint with any justice of the peace in certain specified counties in which she accuses a man of being the father of her child. The justice has the duty to forthwith issue a warrant against the accused person and cause him to be brought before the justice.

The procedure to be followed upon the putative father's appearance before the justice is set forth in some detail in RCW 26.24.020 as follows:

Upon the appearance of the accused, it shall be the duty of such justice to examine the woman, if then present, under oath, in the presence of the man alleged to be the father of the child, touching the charge against him, or, if the woman be not then present, to fix a date for such examination not more than ten days thereafter and to require the accused to give a bond with sufficient surety conditioned that he will appear to answer such charge upon such date, or upon any other date to which such examination may be continued; and in default of the giving of such bond such justice shall cause the accused to be committed to the county jail. The accused shall have the right to controvert such charge and evidence may be heard as in the case of trial of civil actions before such justice. If such justice shall be of the opinion that sufficient cause appears, it shall be his duty to bind the person so accused in bond with sufficient surety payable to the state of Washington and conditioned that he will appear in the superior court of such county at such time or times as the judge thereof may fix or order, to answer such complaint, and abide the judgment and orders of the court; or failing therein, that he will pay such sums of money and to such person as may be adjudged by such court; and the justice shall transmit such bond, together with the transcript of his proceedings, the complaint and the other papers in the case, without delay to the clerk of the superior court of such county. And if the accused shall fail to give a bond as required, such justice shall

commit him to jail until discharged by law. Such bond, or any bond given by said accused on any continuance or arrest, may be put in suit by any person in whose favor the court may adjudge any sum of money in such proceeding.

RCW 26.24.030 provides that such proceeding shall be prosecuted in both the justice court and the superior court by the prosecuting attorney and shall not be dismissed except by him "upon a showing to the court that the provisions herein contemplated to be made for the maintenance, care, education and support of the child have been made."

RCW 26.24.040 provides that a person committed to jail for failure to file the bond required by RCW 26.24.020 or 26.24.090 may be discharged from custody by filing such bond at any time after his commitment.

Provision is made for filing in the superior court the complaint and other papers originally filed in the justice court. The complaint shall stand as the complaint in the superior court and issue shall be joined for trial in that court as now provided in civil actions. Either party may demand a jury trial, if the accused denies the charge.

RCW 26.24.090 provides for a judgment ordering child support and the giving of a surety bond as follows:

In the event the issue be found against the accused, or whenever he shall, in open court, have confessed the truth of the accusation against him, he shall be charged by the order and judgment of the court to pay a sum to be therein specified, during each year of the life of such child, until such child shall have reached the age of sixteen years, for the care, education and support of such child, and shall also be charged thereby to pay the expenses of the mother incurred during her sickness and confinement, together with all costs of the suit, for which costs execution shall issue as in other cases. And the accused shall be required by said court go give bond, with sufficient surety, to be approved by the judge of said court, for the payment of such sums of money as shall be so ordered by said court. Said bond shall be made payable to the people of the state of Washington, and conditioned for the true and faithful payment of such yearly sums, in equal quarterly installments, to the

clerk of said court, which said bond shall be filed and preserved by the clerk of said court.

If the accused fails or refuses to give such bond, the court shall render judgment against the accused for any sum or sums then due and unpaid under the terms of the order and judgment and execution shall issue thereon. Then RCW 26.24.110 contains the following proviso:

*Provided,* That the rendition and collection of judgment as aforesaid shall not be construed to bar or hinder the taking of similar proceedings for the collection of judgment for the nonpayment of any sum or sums becoming due and unpaid thereafter.

Then there follows a section of the statute relating to the commitment of the accused for contempt for failure to give the required bond.

The statute also provides that, whenever default shall be made in the payment of the quarterly installments specified in the bond, the superior court shall issue a citation to the principal and sureties requiring them to appear and show cause why execution should not issue against them for amounts due and unpaid. If payment be not made before the show cause hearing, the court shall render judgment accordingly and execution shall issue.

This court in a unanimous en banc decision upheld a voluntary contract between the mother and the admitted father of an illegitimate child in which the latter agreed to make support payments until the child attained the age of 21, even if the father should die prior to that time. The mother had, prior to the making of the contract, instituted a filiation proceeding against the father, the prosecution of which was held in abeyance pending the outcome of the instant action for specific performance of their contract.

In affirming the trial court's decree of specific performance, this court in *Peterson v. Eritsland,* 69 Wn.2d 588, 591-92, 419 P.2d 332 (1966), made two pertinent observations regarding filiation proceedings:

The making of a contract between the mother of an illegitimate child and the putative father, for the support and benefit of the child, is not offensive to public policy.

Instead, such a course of action is in accord with the policy of our statutory law, which, contrary to common law, makes provision, through filiation proceedings, for fixing the paternal responsibility and duty of support in such cases. RCW 26.24. See, Annot. 39 A.L.R. 444, 159 A.L.R. 1509, and text material in 10 Am. Jur. 2d *Bastards* §§ 70, 71 (1963), and 10 C.J.S. *Bastards* § 19 (1938).

. . .

In the instant case, as already indicated, the contracts are comprehensive. They respectively contain mutual and reciprocating provisions relative to the contracting parties' rights and duties with regard to the children's custody, visitation, residence, adoption, education, heirship, and support. The obligations accepted and imposed by the agreements exceed in a variety of ways those obligations or responsibilities which would arise out of a filiation action. In this latter vein it is to be noted that RCW 26.24.090 provides only that the judgment in a filiation proceeding shall charge the putative father "to pay a sum to be therein specified . . . until such child shall have reached the age of sixteen years," whereas, the instant contractual provisions purport to carry forward, even should the putative father die, until the respective children reach 21 years of age or are otherwise sooner emancipated. Appellants' argument overlooks and ignores these added and substantial covenants, benefits, and detriments. Accordingly, we conclude, as did the trial court, that neither contract lacks valid consideration.

A still more recent case discussing our filiation statute is *In re Adoption of Parsons,* 76 Wn.2d 437, 457 P.2d 544 (1969), which involved the adoption of an illegitimate child which had previously been the subject of a filiation proceeding. In that proceeding the trial court on March 24, 1967, found that the putative father was in fact the father of the child then about to be born to the complaining witness, ordered him to pay the hospital and medical expenses to be incurred, and further ordered him to pay $50 per month support money until the child reached the age of 16. On September 20, 1967 (which was 8 days before the birth of the child), the father's attorney prepared an amended judgment which contained the following provision:

[T]hat said minor child hereinafter to be born to . . . [natural mother] shall not be adopted by any person or persons whomsoever without the full knowledge and writing consent of the defendant . . . [appellant].

This amended judgment was entered by the trial court with the consent of the Prosecuting Attorney but without the knowledge of the mother or of anyone designated to act for her in a legal capacity.

In December, 1967, Mr. and Mrs. S. petitioned to adopt the child. No notice thereof was given to the child's father. He appeared and filed an answer to the petition in which he set forth the amended judgment entered in the filiation proceeding and alleged that he had not and would not consent to the adoption. He prayed that the petition for adoption be dismissed and that the child be returned to its natural mother.

The trial court in the adoption proceeding (which was heard by a judge other than the judge who had tried the filiation proceeding) held that the amended judgment in the latter proceeding purporting to require the father's consent to any adoption of the child was beyond the power of the trial court in the filiation proceeding under RCW 26.24. This court affirmed the trial court's order in the adoption proceeding that the father's consent was not necessary to the proposed adoption. We there said at pages 440, 441, and 442:

Under the provisions of RCW 26.24, filiation actions are initiated by a complaint filed by an unmarried woman in a justice court. RCW 26.24.010. The prosecutor then is empowered to bring an action in the name of the state against the accused natural father for the infant's care, maintenance, support and education. RCW 26.24.030. If the accused is found to be the natural father of the child, under RCW 26.24.090 certain provisions must be made in the judgment for the financial support of the child until the infant reaches the age of 16 years. . . .

Our review of the provisions of RCW 26.24 shows no statutory language providing that the natural father can or may be given the right of consent to any future adop-

tion of the subject infant, and no express provision of that chapter gives the trial court the right to so decree.

. . .

. . . The filiation statutes likewise are clear and unambiguous and do not give authority to the trial court to enter an order, such as the one involved in the present action, requiring the natural father's consent to any future adoption of the child. The purpose of the filiation proceeding is to provide for the care, maintenance, support and education of the illegitimate child and cannot have any effect as to subsequent adoption proceedings involving that child.

. . .

. . . When the trial court, in its amended judgment, decreed that the natural father had the right to exercise his consent in any subsequent adoption proceeding involving the illegitimate child, it attempted to exercise a power which in no way can be inferred from the provisions of either RCW 26.24 or RCW 26.32. Furthermore, in enacting RCW 26.32.040(5), the legislature expressly excluded this power of consent in the case of a natural father of an illegitimate child.

In view of the express provisions of RCW 26.32.040(5) and the lack of statutory authority in the trial court to effect a subsequent adoption of an illegitimate child in an order entered in a filiation proceeding, it is our conclusion that the trial court acted in excess of its jurisdiction in entering the disputed amended judgment in the filiation proceeding and that the amended judgment so entered is void. Therefore, appellant has no status to be heard, as he alleges, in the adoption proceeding.

In my opinion these two recent decisions of this court above quoted should be controlling as to the correct construction of the filiation statute. The majority opinion in the present case adopts a contrary interpretation of the statute with which I am unable to concur.

With reference to the constitutional separation of powers, article 2, section 1, of our constitution provides:

The legislative authority of the state of Washington shall be vested in the legislature . . .

The majority state:

When the legislature enacted Laws of 1919, ch. 203, p. 709, now RCW 26.24, it created an entirely new and

complete filiation act. No reference was made to the 1881 act and understandably so—it had been "out of the books" for 14 years. The legislature was neither amending nor reviving an existing act.

With this statement I am in agreement, but I disagree with the reasoning which the majority adopt to the effect that:

> Overriding all technical rules of statutory construction must be the rule of reason upholding the obvious purpose that the legislature was attempting to achieve. . . .
>
> In light of these principles, we take note of the obvious intention of the legislature—to provide for paternal support of illegitimate children. This type of legislation is for the benefit of the child, not the parents, and must be viewed and construed in light of the changed concept of the position of an illegitimate child in our society. In so reading the 1921 act, it is our view that the legislature did not intend that a filiation order entered prior, at, or within 2 years of the time of the child's birth was to be frozen for from 14 to 16 years and that courts could not consider, during that time, changes in the child's needs or the condition of the parents' ability to meet those changing requirements. Further, the act itself evidences an intent that the courts have a continuing jurisdiction over the subject matter. Otherwise, there would be no provision for subsequent hearings regarding default in payments or failure to post bond. RCW 26.24.110-.150.

I am of the opinion that the filiation act which was adopted by the legislature 50 years ago cannot now, for the first time, be viewed by this court as including the power to change from time to time a judgment fixing the father's obligation to support his illegitimate child. The act means the same thing today as it did in 1919. The majority says that the act must be viewed and construed in the light of the changed concept of the position of an illegitimate child in our society. I ask *whose* changed concept? That of this court? Certainly the legislature has not indicated any change of its concept during the last 50 years. I think that the majority is, in legal effect, amending the filiation statute by permitting multiple hearings regarding child support in filiation proceedings where the legislature provided for only one. There is no evidence to indicate that the

legislative concept regarding this problem has ever changed.

If I were a member of the present legislature, I might strongly advocate such change, but that matter is immaterial now.

I base my view that this case presents solely a problem for the legislature upon the majority opinion in *State ex rel. Hagan v. Chinook Hotel, Inc.,* 65 Wn.2d 573, 399 P.2d 8 (1965), which was heard en banc. That case involved the meaning of the word "wages" in the Minimum Wage Act. After discussing the original act of 1959 and the amendatory act of 1961, with reference to the contention being made by the state that a mistake in draftsmanship was made by the legislature, the majority said at 578:

> This court has many times held that it will not insert, in legislative acts, words which were seemingly unintentionally omitted, nor disregard any words which may appear to us to have been inadvertently included.

The majority then quoted from six decisions of this court stating the same rule as to the power of the legislature. Later in the opinion the majority quoted the pertinent rule at 580:

> " 'The intention of the legislature is to be deduced from what it said.' *In re Sanborn,* 159 Wash. 112, 118, 292 Pac. 259."

Applying these rules to the case at bar, there is nothing in the record which, in my opinion, warrants this court in holding that the legislature either in 1919 or at the present time intended that the trial court in a filiation proceeding should have continuing jurisdiction over the matter of fixing the amount of child support to be paid by the father. It has jurisdiction to fix the amount originally and thereafter may compel payments of that sum as they accrue, all in the manner provided for in the act.

I think that the statement contained in the dissenting opinion of Mr. Justice Harlan in *Wesberry v. Sanders,* 376 U.S. 1, 48, 11 L. Ed. 2d 481, 84 S. Ct. 526 (1964), as to the

separation of powers is applicable to the present case. He there said:

This Court, no less than all other branches of the Government, is bound by the Constitution. The Constitution does not confer on the Court blanket authority to step into every situation where the political [referring to the legislative] branch may be thought to have fallen short. The stability of this institution ultimately depends not only upon its being alert to keep the other branches of government within constitutional bounds but equally upon recognition of the limitations on the Court's own functions in the constitutional system.

I would reverse the trial court's order with directions to dismiss the petition.