[No. 521-3.   Division Three.   May 18, 1973.]

LEONARD L. WOOD, *as Administrator, Appellant*, v. JOHN S: DUNLOP *et al., Respondents*.

*David E. Williams* (of *Critchlow, Williams, Ryals & Schuster*), for appellant.

*Willard W. Jones* (of *MacGillivray, Jones, Clarke, Schiffner & Johnson*) and *Lawrence Monbleau*, for respondents.

GREEN, C.J.—On February 8, 1968, Jo Ann Wood, age 20, died following minor surgery performed by defendant, John S. Dunlop, in the defendant Tri-State Memorial Hospital in Clarkston. She was survived by her plaintiff husband, Leonard L. Wood, age 22, and a 2-year-old son. On May 6, 1970, plaintiff, as administrator of the decedent's estate, brought this action against defendants for wrongful death. Defendants denied liability and alleged as a defense

that the claim had been settled and released by plaintiff. A separate jury trial was held to determine the validity of the release. From judgment of dismissal, plaintiff appeals.

The assignments of error are directed to rulings of the court which plaintiff contends unduly limited the issues submitted to the jury.

Plaintiff was a newcomer to Clarkston. Because his brother lived in Clarkston, he and his family moved there to look for work. They lived in a rented apartment. After his wife's death, plaintiff and his son lived with his brother and family. At that time, he was unemployed.

After his wife's death, plaintiff learned from Dr. Dunlop that her death resulted from defendants' negligence and that an insurance adjuster would contact him regarding the matter. The next day, Floyd Rector, an adjuster for defendants' insurance carriers, met with plaintiff and his brother at the latter's home. After the adjuster obtained information necessary to place a value on the claim, plaintiff told the adjuster he wanted to settle it as soon as possible. The adjuster then returned to his office in Spokane.

Subsequently, plaintiff initiated several contacts with the adjuster to determine the status of the settlement—some by telephone and three or four others by trips to Spokane. A week after plaintiff's first conversation with the adjuster, he and his brother went to Spokane to press for resolution of the claim. At that time the adjuster stated he was authorized to offer $18,000. After discussing the offer with his brother,[1] he told the adjuster that he would accept the settlement.

---

[1] Defendant testified:

"Well, I asked him if they found out how much they were going to pay, and he told me they did, it would be $18,000.00 and I told my brother, Bob to — they had a drinking fountain there in a large room. I told him to walk over to the drinking fountain. And I told Bob, 'Doesn't seem like to me it is enough,' and Bob told me, he said, 'Well, you are unemployed; we borrowed $20.00 to get over here, so $18,000.00 is better than going to Court, going to trial.' We went back over to Mr. Rector's desk and I told Mr. Rector, I said, 'Well, if I didn't want to accept the $18,000.00,' I said, 'I would have to hire myself an attorney and would have to take this to court.' Mr. Rector said, 'yes, that is

Plaintiff testified the adjuster told him that before the settlement could be concluded, he would have to be appointed "legal guardian and realtor" of the estate and would need a lawyer to do that work. Because plaintiff did not know a lawyer in Clarkston, the adjuster suggested one. Plaintiff talked to the lawyer by telephone and "I told him I had just been offered $18,000.00, and I was told I had to be appointed legal guardian of my son."

After plaintiff was appointed administrator of his wife's estate, the adjuster came to Clarkston and delivered two drafts to plaintiff—one draft from Aetna Life & Casualty Co. for $7,200; and the other from St. Paul Fire & Marine Insurance Co. for $10,800. Each draft was payable to "Leonard L. Wood, individually and as administrator of the estate of Jo Ann Wood." In exchange for the drafts, plaintiff executed a release reciting a consideration of $18,000. The release was signed by plaintiff, individually, but the endorsements on the two drafts were by plaintiff, individually, and as administrator of the estate of Jo Ann Wood.

Upon receiving the money on March 27, 1968, plaintiff opened a savings account. Within 2 days thereafter, he purchased a 1968 Chrysler Imperial automobile for $4,200, paid the rent on the apartment where he and the decedent had been living, purchased clothes for his own son and for the wife and children of his brother, and bought a stock of groceries for his brother. Thereupon, he left Clarkston for California and Nevada to visit relatives.

The trial court ruled that the plaintiff's execution of the release and endorsement of the settlement drafts were in his capacity as administrator of his wife's estate and constituted a bar to the plaintiff's action for wrongful death, unless the jury found that plaintiff lacked the mental capacity to execute the release or the consideration was so grossly inadequate as to shock the conscience of a person of

---

true.' My brother Bob said, 'And that could take some time.' Mr. Rector said, 'That is right.' So I told Mr. Rector, I said, 'That is fine; can you give me the check now?' "

ordinary sensibilities. The jury found for defendants and plaintiff's complaint was dismissed.

■ ■ First, plaintiff contends the court erred in ruling as a matter of law that the release and drafts constituted a release of the individual claims of both the surviving husband and son. It is asserted this issue presented a jury question as to whether the parties intended to settle both claims. We disagree. Since the release and two drafts were all part of the same transaction, the trial court properly construed them together. *Dennis v. Southworth,* 2 Wn. App. 115, 120-21, 467 P.2d 330 (1970). It is clear that the administrator of a decedent's estate is the only one who can bring an action or compromise a claim for wrongful death even if there are a number of beneficiaries. RCW 4.20.010; RCW 4.20.020; *Hansen v. Stimson Mill Co.,* 195 Wash. 621, 81 P.2d 855 (1938); *In re Estate of Perrigo,* 47 Wn.2d 232, 287 P.2d 137 (1955). Although the release was signed by plaintiff individually, it is clear, considering the drafts and release together, that he was acting in his capacity as administrator of the estate. The consideration recited in the release, $18,000, is the exact total of the two drafts, both of which were payable to and endorsed by plaintiff "individually and as administrator of the estate of Jo Ann Wood." Plaintiff's testimony[2] shows that he knew that he was act-

---

[2] Plaintiff testified:

"So I told Mr. Rector, I said, 'That is fine, can you give me the check now?' Mr. Rector said, 'No, you have to be appointed legal guardian and realtor of the estate', I believe is what it was. . . . . I talked to Mr. Little (the attorney) on the phone from Mr. Rector's office. I told him I had just been offered $18,000.00, and I was told I had to be appointed legal guardian of my son. I know at the time I thought that was kind of funny you had to be appointed legal guardian of your own son. . . .

"Q Mr. Rector in the course of discussions with you leading up to the ultimate settlement of the case likewise discussed to you your loss in terms of your loss and your son's loss?

"A Yes.

"Q Mr. Rector did advise you before the $18,000.00 you agreed to accept could be deliverd to you you would have to be appointed administrator of your wife's estate?

"A Correct.

ing for himself and his minor son in the settlement of the claim arising from his wife's death.

The parties' intent to settle all claims is further evidenced by the documents themselves. The release was captioned "RELEASE IN FULL"; it purported to release defendants from *"all claims . . . from* an accident to JO ANN WOOD which occurred on or about the 25th day of February, 1968, by reason of surgical procedure accident and of and for *all claims* or demands *whatsoever* in law or in equity . . ." The Aetna Life & Casualty Co. draft stated on its face "in satisfaction of *all claims"* and was marked "final." The St. Paul Fire & Marine Insurance Co. draft states immediately above plaintiff's endorsement "This draft constitutes settlement *in full* of the claim or account described on the face hereof." On the face of that draft was the claim number, the "date of loss 2-9-68", "kind of loss—Malp. LOA-final." The loss on 2-9-68 could only refer to decedent's death. Defendant testified he was told and understood the release was in full. Thus, we find no error in the court's ruling that the three documents constituted a release of all claims as a matter of law unless otherwise invalidated.

---

"Q Did you inquire of him why that was necessary?

"A Yes.

"Q Didn't he tell you it was necessary because before you could settle the case and act for your son this would be necessary?

"A Well, sir, he told me I should be appointed realtor of the estate and legal guardian. When I asked why I should be appointed legal guardian of my son he explained—I know I was puzzled why I should be appointed legal guardian of my own son.

"Q Can we agree at least you were aware that for some reason that perhaps you did not understand completely that you had to be appointed administrator with respect to the settlement so you could act for your son?

"A Yes, I was told I could not get the money unless I was appointed. . . .

"Q Is it your own knowledge you knew at the time this settlement was entered into you were settling not only your claim but your son's claim, you were acting for yourself and him?

"A The understanding I was given, sir, was I was acting for myself and my son was part of the family and was a minor, I was to be watching out for him."

■■ ᐧSecond, it is contended the court erred in the giving of instruction No. 7:

> You are instructed that a person is deemed to possess the mental competency or capacity to enter into a contract, including a release, if such person at the time the release was executed possessed sufficient mind or reason to reasonably understand the nature, terms and effect of the release.
>
> Lack of mental capacity to execute a release does not necessarily mean insanity, idiocy or some other form of general mental illness.

This instruction is a correct statement of the law. *Grannum v. Berard,* 70 Wn.2d 304, 422 P.2d 812, 25 A.L.R.3d 1434 (1967); *Peterson v. Eritsland,* 69 Wn.2d 588, 419 P.2d 332 (1966). Plaintiff argues the instruction should have informed the jury that one who did not have the requisite capacity could disclaim the release. We disagree. This was covered in the issues instruction;[3] a fair reading of all the instructions leaves no doubt that if the jury found plaintiff lacked the mental capacity to execute the release, they would find for the plaintiff.

Third, it is contended the court erred in refusing to give plaintiff's proposed instructions No. 2, 11, 12, 13, 14, 15, 16, 17, 19 and 20, all of which relate to the issue of whether the release was executed as a result of imposition, fraud, duress, undue influence and superior knowledge practiced upon the plaintiff by the adjuster, Rector. We are unable to find any substantial testimony justifying the submission of these issues to the jury. To the contrary, the record shows that plaintiff pursued Rector to obtain a settlement offer and thereafter relied upon the counsel of his brother in his.

---

[3]"The court has determined as a matter of law, and you shall accept as a fact, that the plaintiff as administrator of his wife's estate, did execute instruments which, unless invalidated on other grounds, effectively released his and his son's claims against the defendant.

"The plaintiff claims that said release of the claim against defendants arising from the death of Jo Ann Wood was invalid because, under all the circumstances surrounding his signing thereof, the plaintiff lacked. the mental capacity to validly execute the same.

"The defendants deny the foregoing contention of the plaintiff."

decision to accept the offer, rather than retain an attorney. Plaintiff argues that Rector should have fully explained plaintiff's rights with respect to the separate claims of plaintiff and his son. No authority has been cited to us that would support this position in the context of the facts presented. Rector and plaintiff dealt at arm's length. Plaintiff knew Rector was an adjuster representing defendant's insurance carriers. Plaintiff was specifically informed that if he believed $18,000 was not enough, he should retain an attorney. His decision not to retain an attorney was made as a result of consultation with his brother and was not the result of any statements or actions by Rector. Plaintiff's proposed instructions were properly refused.

Fourth, error is assigned to the giving of instruction No. 11.[4] It is contended the instruction prejudicially duplicates instruction No. 9.[5] Even though the court in chambers had determined in its discretion not to give the instruction which is a correct statement of the law, *Lambert v. State Farm Mut. Auto. Ins. Co.*, 2 Wn. App. 136, 467 P.2d 214 (1970), we find no error. Recognizing that instruction No. 11 may, in part, duplicate instruction No. 9 relating to the issue of the adequacy of the consideration, defendant was not prejudiced. The adequacy of the consideration was disputed; plaintiff's experts testified the claim was worth a minimum of about $60,000, while defendant's experts testified the settlement was reasonable.

Fifth, it is contended the court unduly limited plaintiff's cross-examination of Rector by sustaining objections to questions relating to his qualifications as an adjuster,

---

[4] "If a person possesses the mental capacity to contract, and voluntarily executes a release in exchange for something of value, the mere fact that such party makes an improvident or bad bargain, in and of itself, is not a sufficient basis to avoid the effect of the release. This is true even though the party executing the release was in necessitous financial circumstances at the time."

[5] "If you find that the release was given for inadequate consideration, the release may not be avoided solely on that ground unless you likewise find that the consideration was so grossly inadequate as to shock the conscience of a person of ordinary sensibilities."

applicable policy limits, reserves set up for the claims arising from decedent's death, availability of court approval in minor settlements, the impression Rector wished to leave with the plaintiff in dealing with him, the truth of Rector's "take it or leave it" approach to plaintiff, plaintiff's understanding of symbols on one of the settlement drafts and what Rector would have done had plaintiff turned down the offer. The scope of cross-examination lies within the discretion of the trial judge; we find no abuse of that discretion. Further, no offer of proof was presented. *Smith v. Seibly,* 72 Wn.2d 16, 431 P.2d 719 (1967). In any event, the thrust of the inquiries goes to whether Rector should have disclosed these matters to the plaintiff. As indicated previously, we find no such duty resting upon Rector in the context of the facts of this case; nor do we find any merit to the contention that the court's rulings upon objections conveyed any impression to the jury that plaintiff was engaged in improper tactics.

Sixth, it is urged the court erred in denying a motion to limit evidence of plaintiff's expenditure of funds received from the settlement. We find no error. The court limited the expenditures to the 2 days immediately following the receipt of the money insofar as it might bear upon the mental competency of plaintiff on the day of settlement. We find no abuse of discretion in the admission of the testimony. It is noted that defendants wanted to show subsequent improvident expenditures in a Montana logging venture, but the trial judge ruled such evidence to be too remote on the issue.

The judgment of dismissal is affirmed.

MUNSON and MCINTURFF, JJ., concur.

Petition for rehearing denied June 11, 1973.

Review granted by Supreme Court September 25, 1973.