[No. 38485.    Department One.    January 19, 1967.]

HAROLD GRANNUM, *Appellant,* v. WILLIAM P. BERARD *et al., Respondents.*\*

\*Reported in 422 P.2d 812.

*Benjamin P. Shuey,* for appellant.

*Williams, Lanza, Kastner & Gibbs,* by *Henry E. Kastner,* for respondents.

HUNTER, J.—This is an action to recover damages for technical assault and battery resulting from the performance of an alleged unauthorized operation on the plaintiff (appellant), Harold Grannum, by the defendant (respondent), Dr. William B. Berard, a physician and surgeon.

The complaint alleges that Dr. Berard performed a "septal reconstruction" upon Mr. Grannum on April 20, 1963, at Cabrini Hospital in Seattle, without his consent and that as a result of the operation he has suffered permanent damage to his health.

The record shows that Dr. Daniel R. Kohli, M.D., plaintiff's personal physician, hospitalized the plaintiff following a scuffle he had with his eldest son on Saturday, April 13, 1963. Plaintiff's original complaint of severe chest pain was diagnosed as a minor muscle strain instead of the suspected coronary. He could have been released the day following admission, except that Dr. Kohli thought it advisable he remain hospitalized until his domestic problems could be somewhat settled.

Because of plaintiff's complaints regarding his nose and his difficulty in breathing through one nostril, Dr. Kohli asked the defendant to see the patient. Dr. Berard, a specialist in ear, nose and throat examined the plaintiff on Tuesday, April 16, 1963. He found an external nasal deformity in that the bony part of plaintiff's nose, the pyramid, had been broken in a childhood accident and never set. The right nasal bone was higher than the left. As a consequence of this injury, the septum continued to grow in a manner markedly deflected into the right side and was obstructive to breathing. In the presence of infection, this obstruction would tend to make the plaintiff have recurrent sinusitis

and sore throat. Following this examination Dr. Berard advised that corrective surgery be performed. The plaintiff agreed.

On the following day, Wednesday, April 17th, Dr. Kohli discussed the proposed surgery with the plaintiff and his oral assent was again given on that day. On the 18th of April Dr. Berard consulted with the plaintiff, at which time he selected Saturday, April 20th, for the day of the operation so that he would not miss more time from work by carrying the matter over into the next week. On Friday, April 19th, the hospital admitting nurse, Mother Pia, obtained the plaintiff's written consent to the operation, "Authorization for Medical and/or Surgical Treatment," (exhibit 1). The operation went ahead as planned and in terms of gravity has been termed as minor surgery.

At the trial no proof of negligence was offered and the plaintiff's theory of recovery was limited to an alleged showing of common law battery based on his claimed incapacity to consent to surgery while under the influence of drugs.

The trial court directed a verdict for the defendant and the plaintiff has appealed, contending that judgment entered on the verdict should be reversed and the cause remanded for submission to the jury on the issues of lack of consent and damages. He contends that his signature on the surgery authorization form and his indications of oral consent were ineffective, since his mental and emotional condition as affected by heavy dosages of drugs was such that he was incapable of exercising a sufficient mental faculty to make an intelligent choice whether to authorize the operation.

■ The rule is well established that in surgical cases, consent to such procedure must be obtained from either the patient, or, if the patient is under some disability, from a near relative capable of giving consent. 70 C.J.S. *Physicians and Surgeons* § 48, *et seq.*, 1 Harper & James, Torts § 3.10, p. 235; The Law of Medical Practice § 1.05, p. 10. Such consent to surgery may be manifested in a number of ways: as an express consent the patient may sign a formal written per-

mission or agree orally; he may give implied authority by his conduct, as in voluntarily submitting to an operation, or by failing to object. See "Law of Hospital, Physician, and Patient," Hayt, Hayt & Groeschel, pp. 253-54 (2d ed. 1952).

■ The mental capacity necessary to consent to a surgical operation is a question of fact to be determined from the circumstances of each individual case. In *Peterson v. Eritsland,* 69 Wn.2d 588, 419 P.2d 332 (1966), we stated:

> The mental competency or capacity of an individual to execute an agreement, when challenged, presents a factual issue to be determined by the trier of the fact, with the test being whether the person in question, at the time of executing the contract, possessed sufficient mind or reason to enable him to understand the nature, the terms and the effect of the transaction. *Page v. Prudential Life Ins. Co. of America,* 12 Wn.2d 101, 120 P.2d 527 (1942); *Harris v. Rivard,* 64 Wn.2d 173, 390 P.2d 1004 (1964). This is true whether the questioned mental condition be the product of disease, age, alcohol, or drugs. 17 C.J.S. *Contracts* § 133(1) (1963).

It is well settled that the law will presume sanity rather than insanity, competency rather than incompetency; it will presume that every man is sane and fully competent until satisfactory proof to the contrary is presented. 29 Am. Jur. *Insane And Other Incompetent Persons* § 132, p. 253. In Washington we have held that the standard of proof required to overcome this presumption, in civil cases, is that of clear, cogent and convincing evidence. *Page v. Prudential Life Ins. Co. of America,* 12 Wn.2d 101, 120 P.2d 527 (1942); *Roberts v. Pacific Tel. & Tel. Co.,* 93 Wash. 274, 160 Pac. 965 (1916).

The evidence discloses the plaintiff was deeply depressed and emotionally distraught during his stay in the hospital. Notes of the floor nurses indicate that the patient was found crying a number of times and, on occasions when he talked, he had tears in his eyes.

Leo Ball, a co-worker of the plaintiff, testified that he visited the plaintiff on the Monday following his admission to the hospital, at which time the plaintiff did not recognize him. Mr. Ball stated that the plaintiff did not act like

himself and contrary to his normal demeanor spoke freely of his home problems in a manner which the witness thought was most private. Mr. Ball thought the plaintiff was under the influence of drugs.

The plaintiff's wife testified that she visited the plaintiff daily, bringing him the newspaper. She stated that he didn't act like himself during these visits, in that he was very depressed and uncommunicative. The plaintiff told her that Dr. Berard was going to operate; she made no attempt to prevent the operation.

The plaintiff testified that he was unable to remember details of these happenings during his stay in the hospital. Yet when asked if he remembered whether Dr. Berard was going to operate on him, he testified: "I believe I do, sir, yes, I do." At other points in the record the plaintiff testified that he was aware that Dr. Berard was going to fix his sore throat. He further testified that he remembered the time just before the operation and was awake when it was performed.

The hospital charts reveal that the plaintiff was administered various dosages of morphine, librium, carbital and parnate; the largest doses given during the first few days of his confinement.

The plaintiff submitted evidence indicating that the drug "parnate" had subsequently been removed from the market by order of the federal government; since it had been found to produce harmful side effects, in some cases, when used in conjunction with sedatives and narcotics. The plaintiff had received both sedatives and narcotics.

The actual effect of these drugs on the plaintiff at the times consent was given was testified to by Dr. Kohli, as a defense witness. He stated that parnate, while capable of producing almost anything in the way of manic side effects, did not seem to affect the plaintiff. He testified that the drugs prescribed should have improved the plaintiff's reasoning power by lifting him out of his depression. Both doctors testified that at the times they saw the plaintiff he was depressed, but not so emotionally distraught as to be incapacitated.

All of this evidence, taken together, while establishing that the plaintiff was deeply depressed, is either inconclusive or speculative as to whether the plaintiff was incapable of giving consent to the surgical operation on the three occasions mentioned in the record.

In view of this record and the complete absence of medical testimony as to the plaintiff's claimed mental incapacity, we do not believe there is room for reasonable minds to differ that the plaintiff has failed to overcome by clear, cogent and convincing evidence the presumption that he comprehended the nature, terms and effect of the consent given for the surgical operation. The trial court properly so held as a matter of law by directing a verdict for the defendant.

The judgment is affirmed.

HILL, ROSELLINI, and OTT, JJ., and BARNETT, J. Pro Tem., concur.

*Reported in 422 P.2d 817.