[No. 58-40709-2.    Division Two.    April 24, 1970.]

J. G. WATKINS et al., *Respondents*, v. W. M. PARPALA, *Appellant.*

William D. Cameron and Williams, Lanza, Kastner & Gibbs, for appellant.

Leon L. Wolfstone, Wolfstone, Panchot, Kleist & Bloch, and Lee J. Campbell, for respondents.

PEARSON, J.—This is an action against defendant dentist, claiming malpractice, in which, following a jury verdict in favor of the defendant, the trial court granted plaintiff a new trial, limited to the issue of damages.

The pertinent facts are as follows. On or about February 1, 1965 plaintiff consulted defendant for the purpose of having her remaining 10 upper teeth extracted and a denture prepared. The procedure was elective in the sense that no immediate emergency existed, although the teeth were irregular, discolored and had some decay.

On February 8, 1965, the four back teeth (two upper left bicuspids and upper left and right second molars) were extracted and on February 25, 1965 the six upper front teeth were extracted. Defendant testified that he placed sulfa in the tooth sockets and sutured the areas of the extracted upper second molars and bicuspids,[1] and advised plaintiff to return for "checkups" which she did during the month of March, 1965.

---

[1]Since the extracted six front teeth are not involved in the claimed malpractice, we will not detail their follow-up treatment.

What occurred at the time of these five or six post-extraction checkups was a matter of conflicting testimony. Plaintiff testified that during several of these checkups she complained to defendant of a peculiar gurgling sensation upon an intake of fluids and a feeling of air in the upper jaw going into her sinus, with a whistling sensation as well as a loss of suction in her mouth. Her version was that defendant advised her to quit complaining and worrying about it. Defendant denies that any of these complaints were made to him prior to the taking of dental impressions on April 1 and 7, 1965. His former dental technician tends to corroborate his testimony in this regard, having been unable to recall any of these unusual complaints.

On April 1, 1965, Dr. Parpala's visual and digital examination revealed to him nothing abnormal with reference to plaintiff's gums and consequently the first of two dental impressions were taken. Plaintiff testified that she made no complaint on that day of the unusual symptoms she continued to experience. The first impression involved the use of a pink mixture known as "Jeltrate." No X rays were taken prior to the impressions. The impression material, in a tray, was pushed firmly against the gums, held there for a time until partially hard, and then removed.

On April 7, 1965, a like impression was taken, using a red material called "Co-oral-ite" and using a special mouth-conforming tray made from a model produced from the "Jeltrate" impression. She experienced a sharp pain upon the withdrawal of the "Co-oral-ite" impression. On April 16, 1965 her denture was ready and two subsequent denture adjustments were made without complaint.

On June 7, 1965, plaintiff telephoned defendant, complaining of swelling, pus drainage, and a repugnant odor from her mouth. She was immediately examined, x-rayed, and referred to Dr. E. Z. Jones, an ear, nose and throat specialist whom she first visited on June 18, 1965. She also consulted Dr. John C. Korvel, a general practitioner, on July 8, 1965, who ordered X rays of her left sinus. These were obtained by Dr. Richard Kegel, a radiologist, on July

10, 1965. He thought there might be a "tooth remnant" in the sinus.

Conservative treatment was attempted until September 15, 1965, when Dr. Jones sought consultation with Dr. Paul Osmun, a Seattle ear, nose and throat specialist. On that day Dr. Osmun, assisted by Dr. Jones, surgically removed a foreign substance from plaintiff's left sinus.

The defendant challenges the sufficiency of the identification of this substance. However, our review of the testimony convinces us that there was an issue for the jury, sufficient for them to find that the foreign substance removed by surgery *was*, in fact, "Jeltrate" impression material (exhibit 13).

Plaintiff's principal theory of liability was that the upper left molar, which was the last of the four molars removed, contained a long root which invaded the left sinus. When the extraction occurred, a portion of the sinus bone and membrane adhered to the extracted root, leaving an air passage (referred to as a "fistula") from the root canal into the sinus. In the exercise of reasonable care, Dr. Parpala knew or should have known that such opening was present at the time the impressions were taken. Dr. Parpala conceded that had he known the passage was not closed, it would not have been proper to proceed with the impressions because of the risk of forcing the material into the sinus opening, with the attending risk of infection. He testified, however, that the only way in which to diagnose the condition (other than visual and digital examinations which he made and which might not disclose it) was by the presence of abnormal symptoms which he testified the patient did not complain about prior to the time the impressions were taken.

In any event, the plaintiff was required to undergo surgical procedures on two later occasions to close the fistula and control the infection. The second surgical procedure was done by an oral surgeon, Dr. George Dore.

Seven expert witnesses were called to testify in addition to the defendant. We have studied their testimony care-

fully. There was no substantial dispute that the proper standards of dental practice required the closure of the fistula prior to taking the impressions if the presence of the fistula were known to the dentist. There is likewise little dispute that unusual complaints of the patient referred to above having to do with air going from the mouth into the sinus would put the dentist on reasonable notice of the presence of an opening.

The point of disagreement among the experts had to do with whether or not, absent the unusual complaints of the patient, a dentist, exercising reasonable care, should have discovered the fistula prior to taking impressions. The experts appearing on defendant's behalf, namely, Dr. Roy West, Dr. Paul Smith, Dr. Edward Nowak, Dr. Boyd Myers and Dr. Donald Walker, tended to support Dr. Parpala's testimony that a dentist exercising ordinary care could have missed the existence of an opening of sufficient size to allow the impression material to invade the sinus. Dr. David Dore testified that a dentist could not help but see a hole large enough to receive exhibit 13.

There was conflicting expert testimony as to whether or not X rays (which would have shown that the root invaded the sinus) should have been taken prior to extracting the teeth. Some experts felt this was unnecessary, since it was not an uncommon condition and, in any event, the cavity usually fills rapidly and regenerates bone quickly. All experts who were questioned on the subject agreed that the penetration of an impression material into the sinus cavity was a rare, unusual and unexpected occurrence.

Following a jury verdict, the trial court granted plaintiffs a new trial, limited to damages, stating that it had erred in not granting plaintiff's motion for a directed verdict. In its order granting this relief, the trial court stated:

> The court does further find and decree that an error in law occurred at the trial duly excepted to by the plaintiffs in that the court should have granted to the plaintiffs a directed verdict on the issue of liability for the reason that the evidence overwhelmingly justified and dictated such a decision upon the part of the court.

We believe the trial court erred in making this ruling and that the evidence we have outlined above presented a clear issue of fact as to defendant's negligence. We think that factual issue concerned the question of whether or not plaintiff made the unusual complaints to the defendant prior to the taking of the impressions, which complaints would have suggested the presence of the fistula. Plaintiff testified that these complaints were made. Defendant denies that they were made and his dental assistant could not recall their being made. We believe the trial judge invaded the jury's province in accepting plaintiff's testimony on the disputed factual issue.

■ The rule applicable in a case of this kind was stated in *Frasch v. Leedom*, 62 Wn.2d 410, 414, 383 P.2d 307 (1963).

[A] challenge to the sufficiency of the evidence, a motion for dismissal or for directed verdict, or a motion for judgment notwithstanding the verdict admits the truth of the opponent's evidence, together with all reasonable inferences arising therefrom, and requires a most favorable interpretation thereof. No element of discretion is involved, and such motions can be granted only when the court can say, as a matter of law, there is no substantial evidence to support the opponent's claim. *Williams v. Hofer*, 30 Wn. (2d) 253, 191 P. (2d) 306; *Lambert v. Smith*, 54 Wn. (2d) 348, 340 P. (2d) 774; *Miller v. Payless Drug Stores of Washington*, 61 Wn. (2d) 651, 379 P. (2d) 932.

■ The rules governing the duty and liability of a dentist to his patient correspond to the rules applicable to physicians and surgeons generally. They are obliged to render the degree of care and skill of average competent practitioners acting in the same or similar circumstances. *See Hill v. Parker*, 12 Wn.2d 517, 122 P.2d 476 (1942); *Pederson v. Dumouchel*, 72 Wn.2d 73, 431 P.2d 973 (1967); 83 A.L.R.2d 7 (1962).

Viewing the evidence favorably to the defendant, the issue of whether or not Dr. Parpala complied with the required standards of dental practice was a question for the

jury and the trial court erred in granting a judgment notwithstanding the verdict.

Plaintiff argues, however, that a directed verdict would have been justified by application of the doctrine of informed consent. The record does establish that Dr. Parpala did not inform plaintiff of the possibility of a fistula developing with the likelihood of foreign material ingestion into the sinus. Therefore, plaintiff argues, since the procedure was elective, Dr. Parpala was liable for an unauthorized procedure.

■ The doctrine of informed consent has not been the subject of any Supreme Court decision in this state to date. However, it would logically follow that if a physician, or as in this case, a dentist, must obtain the consent of the patient in order to perform a surgical procedure (*see Grannum v. Berard,* 70 Wn.2d 304, 422 P.2d 812 (1967)), the consent must be an informed consent with the normal or serious risks of the surgery communicated to the patient. *See* 75 Harv. L. Rev. 1445 (1962) for a discussion of the development of this theory of liability.

The courts which have recognized this theory of liability, have in general premised it either on negligence in failing to disclose the probable result or assault and battery, in that the failure to disclose the risk renders the consent ineffective. *See Watson v. Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964) (negligence); *also see Bang v. Charles T. Miller Hosp.,* 251 Minn. 427, 88 N.W.2d 186 (1958) (assault and battery).

While it could be argued from *Grannum,* which was a suit grounded in assault and battery, that this court should premise an informed consent theory of liability on intentional tort principles, we are more inclined to view the doctrine in terms of negligence. Where no consent is given, it is logical to infer the intent necessary to ground an action for assault and battery. But where the patient has consented to the procedure and it becomes a question of whether or not the physician (or dentist) has disclosed the risks inherent in the procedure to the patient, it is difficult

to view that failure, if any, as an intentional tort. We, therefore, prefer to classify the doctrine in the normal negligence or malpractice area.[2]

In the application of this rule, the California courts impose liability on the physician if he "withholds any facts which are necessary to form the basis of an intelligent consent" *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal. App. 2d 560, 578, 317 P.2d 170 (1957), subject only to some discretion where the patient's welfare and apprehension make it undesirable to explain the risk. Expert medical testimony, under the California doctrine of informed consent, is not necessary since the duty to disclose all risks is one imposed by law because of the fiduciary relationship between the physician and his patient.

We think the view disclosed in *Watson,* and which is described in 75 Harv. L. Rev. 1445, 1448 (1962) is a more reasonable approach and more consonant with efficient, effective medical practice and physician-patient or dentist-patient relationships:

"The duty narrows then, in the average case, to disclosure of dangers peculiar to the treatment proposed and of which it is likely that the patient is unaware. The doctor should have little difficulty in choosing from these the risks that are sufficiently serious and likely to occur as to be essential to an intelligent decision by his patient."

We think the California view of this doctrine imposes too great a burden on the physician and would tend to diminish rather than improve his effectiveness. It might in our judgment inhibit exploratory surgery and it would seem to us to make any form of medical testing or experimentation in rare or new disease situations extremely hazardous for the physician to undertake.

We think the physician or dentist should disclose those risks in the contemplated procedure which he, as a reasonable physician or dentist, should know about, and which the

[2]*See Physicians' & Dentists' Bus. Bureau v. Dray,* 8 Wn.2d 38, 111 P.2d 568 (1941) where the Supreme Court characterized an unauthorized surgery as "negligence" for the purpose of determining the applicable statute of limitations.

patient does not—but should know—in order to determine whether to consent to the procedure. *See Watson v. Clutts, supra.*

█ Likewise, we think the question of whether or not a particular risk should be disclosed should have the same evidentiary requirements as any other act of malpractice. The standards of disclosure should require some medical testimony unless the disclosure is so obvious that laymen can recognize the necessity of such disclosure. *See Douglas v. Bussabarger,* 73 Wn.2d 476, 438 P.2d 829 (1968).[3]

In this case, the expert witnesses testified that the unfortunate occurrence was rare; most had never experienced such a result. None testified as to the standards of disclosure. We do not think a verdict could properly have been directed on the lack of informed consent, nor do we believe there was an issue for the jury on this theory of liability.

Next, plaintiff argues that we should uphold a new trial on all issues on the basis of other errors of law, particularly the refusal of the trial court to give several requested instructions. *See Worthington v. Caldwell,* 65 Wn.2d 269, 396 P.2d 797 (1964).

Two of those instructions, JJ and KK, were premised on a directed verdict and were properly refused for the reasons stated above. Two other instructions, GG and HH, had to do with negligence predicated on a general practitioner's failure to refer his patient to a specialist. There was no medical testimony as to any deviation from such standards and they were properly refused.

Plaintiff's proposed instructions CC, DD, EE, and LL pertained to the duty owed by dentists to their patients. The substance of these instructions was given by the trial court in more objective form.

The order of the trial court granting a new trial is re-

---

[3]However, where the emotional well-being of the patient is a factor in whether or not disclosure of a particular risk should be made, we believe expert testimony is essential to establish liability of the physician for failing to disclose such risk.

versed and the case is remanded with directions to enter judgment in accordance with the verdict of the jury.

ARMSTRONG, C. J., and PETRIE, J., concur.

Petition for rehearing denied June 2, 1970.