[No. 48-40427-3.    Division Three.    September 23, 1970.]

FLORENCE A. MASON, *Appellant,* v. W. J. ELLSWORTH, JR.,
*Respondent.*

*George W. Young* and *Robert L. Bell,* for appellant.

*John D. MacGillivray* (of *MacGillivray, Jones, Clarke & Schiffner*), for respondent.

MUNSON, J.—This is a malpractice action by Florence A. Mason against W. J. Ellsworth, a cardio-thoracic and cardio-vascular surgeon, arising out of the latter's puncturing of the former's esophagus during an esophagoscopy.[1] Plaintiff sought recovery on three theories: (1) defendant was negligent in performing the procedure—shown by direct evidence; (2) defendant was negligent in performing the procedure—shown by res ipsa loquitur; and (3) defendant failed to adequately inform plaintiff of the hazards involved in the procedure so that she could grant an informed consent.

The trial court determined as a matter of law: (1) plaintiff had failed to sustain her burden of establishing defendant's negligence by direct proof of a deviation from the accepted medical standard of performance; and (2) the average layman was not in a position to say the perforation

---

[1] An esophagoscopy is a diagnostic procedure usually performed for visual examination of the inner lining of the esophagus. In essence, an endoscope, which is a metal tube with a light on the end, is inserted from the back of the throat down the esophagus to its junction with the stomach so that through the tube the inner lining of the esophagus can be visualized. When a stricture or spasm of the esophagus is encountered, dilators are inserted through the endoscope and into the esophagus for purpose of dilation. During the procedure, it is standard practice to take a piece of tissue from the inner lining of the esophagus for biopsy to determine if the tissue is inflamed, ulcerated or cancerous.

of the esophagus would not have occurred without negligence on defendant's part. The court instructed on plaintiff's third theory; however, the jury found in favor of defendant. Plaintiff appeals.

Plaintiff entered the hospital on November 14, 1965 for a series of diagnostic examinations to determine the cause of her long-standing gastric distress. After 3 days of examinations by Dr. Greer, her physician, he believed her trouble most likely lay in the distal portion of her esophagus. In order to confirm this diagnosis and to determine whether plaintiff had cancer, an ulceration or inflammation of the distal esophagus, Dr. Greer recommended she undergo an esophagoscopy.

Having concluded that an esophagoscopy was required, Dr. Greer discussed with plaintiff his tentative diagnosis, the nature of an esophagoscopy procedure, what it involved, and why he was recommending defendant perform the procedure. Plaintiff agreed to have defendant perform the esophagoscopy. Dr. Greer discussed plaintiff's condition with defendant the morning of November 17 and at noon defendant reviewed plaintiff's hospital chart and test results. Plaintiff was then seen by defendant and a history of her condition, symptoms and complaints was taken. A physical examination was conducted and defendant's consultation report was dictated. Defendant confirmed Dr. Greer's tentative diagnosis and that a diagnostic esophagoscopy should be performed to conclusively determine the cause of her condition. This conclusion was explained to plaintiff. Defendant also discussed with her the purpose and nature of an esophagoscopy, advising it was a reasonably safe procedure and she should be able to be discharged from the hospital the following afternoon or evening. After these discussions with Dr. Greer and defendant, plaintiff signed a surgical consent.

The esophagoscopy was performed under general anesthetic the morning of November 18, 1965. It was found plaintiff had marked esophagitis of the inner lining of the esophagus. The procedure was ostensibly uneventful and

plaintiff was returned to the recovery room in satisfactory condition. Shortly thereafter plaintiff developed severe abdominal pain. Defendant was called and immediately suspected he had perforated plaintiff's esophagus during the procedure. Plaintiff was first placed on conservative treatment for the perforation but the following afternoon, November 19, the perforation—1½ to 2 inches in length—was surgically repaired by Dr. R. E. Ahlquist.

In an esophagoscopy, the most common complications are difficulty in controlling bleeding, allergic reaction to the anesthetic, cardiac arrest from the anesthetic (common to all procedures performed under general anesthetic), and perforation of the esophagus. The risk of such complications is minimal, with the incidence of perforation estimated at ¼ to ¾ of 1 per cent.

Although defendant explained to plaintiff the nature and purpose of the esophagoscopy, and advised her that it was a reasonably safe procedure, he admittedly did not discuss with her any of the inherent risks.

We hold the trial court (A) erred in holding as a matter of law defendant was not negligent in performing the procedure; (B) was correct in not submitting the doctrine of res ipsa loquitur to the jury; (C) erred in submitting the issue of informed consent to the jury; and (D) incorrectly applied the standard of care applicable to establish malpractice.

(A) *Negligence in the Performance of the Diagnostic Procedure.*

By instruction No. 7 the trial court found, as a matter of law, plaintiff had failed to sustain her claim that defendant was negligent in performing the examination. We must examine this ruling, viewing the evidence in a light most favorable to plaintiff and against movant. *Leach v. Weiss,* 2 Wn. App. 437, 439, 467 P.2d 894 (1970); *Lambert v. State Farm Mut. Auto. Ins. Co.,* 2 Wn. App. 136, 138, 467 P.2d 214 (1970).

Dr. Ahlquist, a thoracic surgeon who had performed innumerable esophagoscopies, on cross-examination by de-

fendant described the purpose and nature of the examination and the manner in which it should be performed:

> The esophagoscopy is performed to actually see what the inside of the esophagus from the back of the throat to the stomach looks like. It is performed to diagnose and also to treat certain conditions of the esophagus. You can use an esophagoscope to prove, *so you can take a piece of the inside of the esophagus, like if there is a cancer of the esophagus you want to visualize it. You want a piece of it for biopsy so you know what you are dealing with.* . . . You do it for many many conditions that involve the esophagus. The procedure itself is either done under local anesthesia where you spray the back of the throat with a novocain-like preparation to numb it and you can pass the scope, or you can put the person to sleep. Insert the scope. It would be very similar to a sword swallower in the circus. Most people don't like to swallow swords so we put them to sleep so they are more comfortable. You introduce the tube down the esophagus, looking at all times on the inside of the esophagus so you know that the scope is inside rather than outside. When you get to a narrow area you pass, we call them bougies or dilators, little, much smaller instruments so that *you can dilate up so that you are doing this under direct vision, under direct observation at all times.* That's basically the procedure and the reason it is done.

(Italics ours.)

Dr. McCartan, an internist who had performed the instant procedure since 1955, testified as follows:

> Q . . . Now then what is the technique of the taking of biopsies in the esophagus? A Well, you visualize the area that you wish to biopsy, and under direct visualization you insert the biopsy forcep. . . . Q And there is a light down there and you watch the light *and you can see the end of your pincer here?* A Right. . . . Q And then you are watching through your light and you are looking at the wall of the esophagus and then you take a piece, is that right? A Correct.

(Italics ours.) Dr. McCartan also observed that biopsy pincers could produce a perforation.

Defendant, in describing the manner in which he performed the biopsy, stated:

In her case I dilated it and the dilator went through very —it was—there was a little resistance but not much, . . . I told people there that one has to be careful. This is where you perforate. This is true. No denying this. . . . It wasn't my intention to perforate her, but the dilator went through with little resistance and then slid along. . . . I still don't know whether there is an ulcer, whether it is all spasm or an ulcer there, whether there is anything else there. You can't see it. It is spastic like this. . . . And with the last dilator going through I again tried to move the scope down further. It just was obvious it wasn't going to go. It never dilated up quite the way I felt it should which ruled out simple spasm. . . . I put the scope down as far as I could. I suctioned it out. . . . I took my biopsy forceps . . . I put them under direct vision into this tight area. Now once you get into there you can't see exactly. I thought that I was taking a piece of mucosa. . . . The disease isn't up . . . above the tightened area. . . . It is down inside and that's where I put my biopsy forceps, and that is where I took a couple of small pieces of material . . . I took them in area where the disease is suspected. It was visualized to [a] point, *but where that little nipper was you can't see because it is in this tight area,* . . . I then suctioned her out. Took my esophagoscope out.

(Italics ours.) The tissue contained in the material removed during the biopsy was not taken from the inner lining of the esophagus—mucosa—but from the fibrous portion on the outside wall of the esophagus. None of the witnesses could testify whether the dilators or the biopsy forceps caused the perforation.

The propriety of the apparent deviation by defendant, in taking the biopsy from that portion of the stricture which was not visible, from the procedure as described by Drs. Ahlquist and McCartan presents a question of fact to be determined by the jury under proper instructions. *Jurgens v. American Legion, Cashmere Post 64, Inc.,* 1 Wn. App. 39, 459 P.2d 79 (1969). Thus, the court's ruling as a matter of law in the giving of instruction No. 7 is reversible error.

(B) *Application of Res Ipsa Loquitur.*

■ Plaintiff assigns error to the trial court's refusal to instruct on the doctrine of res ipsa loquitur. The question of whether instructions encompassing res ipsa loquitur may be given was decided in the affirmative in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 382 P.2d 518 (1963).[2] It is essential, however, before the doctrine of res ipsa loquitur is invoked in malpractice suits that the trial court determine as a matter of law whether a lay jury is in a position to infer that the injury suffered would not ordinarily occur unless the person in control of the instrumentality causing the injury was negligent. *Nelson v. Murphy*, 42 Wn.2d 737, 739, 258 P.2d 472 (1953).[3] As expressed in *Louie v. Chinese Hosp. Ass'n*, 249 Cal. App. 2d 774, 786, 57 Cal. Rptr. 906, 914 (1967):

> "The fact that a particular injury suffered by a patient as the result of an operation is something that rarely occurs does not in itself prove that the injury was probably

---

[2] A subsequent case, *Ball v. Mudge*, 64 Wn.2d 247, 391 P.2d 201 (1964), held the failure of the trial court to give an instruction embodying res ipsa loquitur was proper, citing *Chase v. Beard*, 55 Wn.2d 58, 65, 346 P.2d 315 (1959). *Douglas v. Bussabarger*, 73 Wn.2d 476, 438 P.2d 829 (1968) held that a party was entitled to an instruction setting forth the inference which may be drawn from circumstantial evidence. *Douglas* recognizes res ipsa loquitur as a form of circumstantial evidence. As pointed out by Justice Rosellini in his dissent, *Ball v. Mudge, supra*, must be considered as overruled *sub silentio*. This treatment of res ipsa loquitur is in accord with Prosser's view as expressed in W. Prosser, Torts §§ 39, 40 (3d ed. 1964).

[3] Guidelines for this determination as adopted in *Douglas v. Bussabarger, supra*, and *Pederson v. Dumouchel*, 72 Wn.2d 73, 81, 431 P.2d 973 (1967) are set forth in *Horner v. Northern Pac. Beneficial Ass'n Hosps., Inc.*, 62 Wn.2d 351, 360, 382 P.2d 518 (1963) as follows:

> Granting exclusive control of the instrumentality and eliminating voluntary participation or contribution by respondent to the acts producing the injury, we feel that negligence may then be inferred in three situations without affirmative proof thereof: (1) When the act causing the injury is so palpably negligent that it may be inferred as a matter of law, *i.e.*, leaving foreign objects, sponges, scissors, etc., in the body, or amputation of a wrong member; (2) when the general experience and observation of mankind teaches that the result would not be expected without negligence; and (3) when proof by experts in an esoteric field creates an inference that negligence caused the injuries.

caused by the negligence of those in charge of the operation. . . .

"To permit an inference of negligence under the doctrine of res ipsa loquitur solely because an uncommon complication develops would place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used. Where risks are inherent in an operation and an injury of a type which is rare does occur, the doctrine should not be applicable unless it can be said that, in the light of past experience, such an occurrence is more likely the result of negligence than some cause for which the defendant is not responsible."

In the instant case, the medical testimony supports the trial court, *i.e.*, the mere fact of perforating the esophagus during such an examination does not imply negligence on the part of the examiner. Furthermore, defendant's negligence, if any, was not so grossly apparent that a lay jury's determination of this point would be anything more than mere speculation. Therefore, the trial court's action in refusing to instruct on the "doctrine" was correct.

(C) *Informed Consent.*

■ We concur with *Watkins v. Parpala*, 2 Wn. App. 484, 469 P.2d 974 (1970) in holding a cause of action does exist in this state if a surgical procedure is performed without the informed consent of the patient.

The question of whether plaintiff was sufficiently informed by defendant, prior to the examination so that she could intelligently give her consent, is extremely complex. There is a marked divergence of opinion among courts of the various jurisdictions as to what rules are applicable in an informed consent dispute. Our Supreme Court has not been called on directly for an adjudication on this issue.[4]

---

[4]In *Woods v. Pommerening*, 44 Wn.2d 867, 871, 271 P.2d 705, 45 A.L.R.2d 1267 (1954) the Supreme Court held a finding by the trial court that the information given or not given by a physician to the plaintiff represented the usual, customary and standard practice of dermatologists in the community and that the physician did not deviate therefrom, was supported by a preponderance of the evidence.

As observed by Judge Cardozo in *Schloendorff v. Society of N.Y. Hosp.*, 211 N.Y. 125, 105 N.E. 92 (1914):

Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages. (*Pratt v. Davis*, 224 Ill. 300; *Mohr v. Williams*, 95 Minn. 261.) This is true except in cases of emergency where the patient is unconscious and where it is necessary to operate before consent can be obtained.

This has long been the established rule of Washington. *Grannum v. Berard*, 70 Wn.2d 304, 306, 422 P.2d 812 (1967). Likewise, a surgeon need not guarantee a result or that the result will be what is desired. *Fritz v. Horsfall*, 24 Wn.2d 14, 163 P.2d 148 (1945).

Although one who consents to a surgical or diagnostic procedure without sufficient knowledge being provided on which to ground an intelligent consent may technically fall within the area of a battery, we prefer to adopt the general approach of *Watkins v. Parpala, supra,* and treat informed consent as lying within the ambit of unintentional tort law —for want of a better word we could use negligence, or since we are dealing with a profession, malpractice. *Physicians' & Dentists' Business Bureau v. Dray*, 8 Wn.2d 38, 111 P.2d 568 (1941); *Hershey v. Peake*, 115 Kan. 562, 223 P. 1113 (1924); McCoid, *A Reappraisal of Liability for Unauthorized Medical Treatment*, 41 Minn. L. Rev. 381 (1957).

We are not here dealing with a total lack of consent by the patient, nor an overreaching by the physician of the consent given; but rather with determining the law applicable to a situation where a patient consents to a specific diagnostic surgical procedure—esophagoscopy—without being informed of its inherent risks. We do not anticipate this case will be the last word in this area, but that the law's development in this area will be on a case-to-case basis.

The crux of the informed-consent problem as it has been developed in the various courts lies in the necessity for, and use of, expert medical testimony. The majority of juris-

dictions treat informed consent in the same manner as medical malpractice.[5] As a result, plaintiff is required to establish: (1) by expert medical testimony what a reasonable practitioner, under the same or similar circumstances, would have disclosed to his patient concerning risks incident to a proposed procedure, and (2) that the physician has deviated from this standard to the injury of the plain-

[5]*Watkins v. Parpala*, 2 Wn. App. 484, 469 P.2d 974 (1970); *Patrick v. Sedwick*, 391 P.2d 453 (Alas. 1964); *Shetter v. Rochelle*, 2 Ariz. App. 358, 409 P.2d 74 (1965) *modified*, 2 Ariz. App. 607, 411 P.2d 45 (1966). *Dunlap v. Marine*, 242 Cal. App. 2d 162, 51 Cal. Rptr. 158 (1966) and *Tangora v. Matanky*, 231 Cal. App. 2d 468, 42 Cal. Rptr. 348 (1964) construing *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees*, 154 Cal. App. 2d 560, 317 P.2d 170 (1957), *contra Berkey v. Anderson*, 1 Cal. App. 3d 790, 82 Cal. Rptr. 67 (1969). *Di Filippo v. Preston*, 53 Del. 539, 173 A.2d 333 (1961); *Ditlow v. Kaplan*, 181 So. 2d 226 (Fla. App. 1965); *Visingardi v. Tirone*, 178 So. 2d 135 (Fla. App. 1965); *Bowers v. Talmage*, 159 So. 2d 888 (Fla. 1963); *Grosjean v. Spencer*, 258 Iowa 685, 140 N.W.2d 139 (1966); *Roberts v. Young*, 369 Mich. 133, 119 N.W.2d 627 (1963); *Aiken v. Clary*, 396 S.W.2d 668 (Mo. 1965); *Negaard v. Estate of Feda*, 152 Mont. 47, 446 P.2d 436 (1968); *Starnes v. Taylor*, 272 N.C. 386, 158 S.E.2d 339 (1968); *Watson v. Clutts*, 262 N.C. 153, 136 S.E.2d 617 (1964); *Woods v. Brumlop*, 71 N.M. 221, 377 P.2d 520 (1962); *Govin v. Hunter*, 374 P.2d 421 (Wyo. 1962); see also McCoid, *The Care Required of Medical Practitioners*, 12 Vand. L. Rev. 549, 586-591 (1959); Plante, *An Analysis of "Informed Consent"*, 36 Fordham L. Rev. 638 (1968); Note, 60 Colum. L. Rev. 1193 (1960); Note, 34 S. Cal. L. Rev. 209 (1961); Note, 75 Harv. L. Rev. 1445 (1962).

*Modified Malpractice Approach: Williams v. Menehan*, 191 Kan. 6, 379 P.2d 292 (1963) and *Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093 (1960) *modified*, 187 Kan. 186, 354 P.2d 670 (1960) hold that a physician has an obligation to make a reasonable explanation or disclosure to his patient of the risks and dangers which inure in a proposed course of treatment and whatever consent the patient gives to his prescribed treatment may be an informed and intelligent consent. Where a physician is silent and makes no disclosure whatever, he has failed in the duty owed to the patient and the patient is not required to produce expert medical testimony to show that the doctor's failure was contrary to accepted medical practice. Thus, it evolves on the doctor to establish that his failure to make any disclosure did, in fact, conform, under the extant conditions, to accepted professional standards; however, where actual disclosures by a physician have been made and are ascertainable, then expert medical testimony is required to establish that the disclosures made did not accord to those which medical practitioners would divulge under the same or like circumstances. *Collins v. Meeker*, 198 Kan. 390, 424 P.2d 488 (1967).

tiff. This categorization, in effect, tends to emasculate the patient's right to know—it measures that right entirely in terms of the standard of practice of those who are obligated to inform him. The particular standard of practice by physicians in this area may be unreasonable or even negligent under the law. The majority of cases concentrate on defining the physician's duty while merely alluding to the patient's right to know.

We are aware that a given case may require the use of medical expertise to determine what is medically sound in a physician's explanation of a *procedure* to his patient. The medical explanation in the instant case concerning the procedure is not in issue. But it is imperative that it be understood that the basis of the theory of informed consent is *both* the *patient's right* to be reasonably informed of all *material* elements, including risks, which may affect his consent to the procedure *and* the *physician's duty* to inform his patient in a medically sound fashion. The former's right inheres in the long recognized inviolability of the human body;[6] while the latter's duty is grounded upon the strong fiduciary relationship. We agree with appellant that a relationship.[7]

In contrast to the majority approach described above are two apparent positions that have developed in reaction to the grouping of informed consent with malpractice.[8] The first is best expressed by the following excerpt from Myers, *Informed Consent in Medical Malpractice*, 55 Calif. L. Rev. 1396 (1967):

A physician is under an obligation (1) to make a full

---

[6]*Grannum v. Berard,* 70 Wn.2d 304, 422 P.2d 812 (1967); *Schloendorff v. Society of N.Y. Hosp.,* 211 N.Y. 125, 105 N.E. 92 (1914).

[7]*Lockett v. Goodill,* 71 Wn.2d 654, 656, 430 P.2d 589 (1967); *Salgo v. Leland Stanford Jr. Univ. Bd. of Trustees,* 154 Cal. App. 2d 560, 317 P.2d 170, 180 (1957).

[8]*A Special Situation:* Expert medical testimony has been held to be unnecessary where the parties, through pretrial discovery, have determined that the trial will revolve around the credibility of the patient and physician concerning information allegedly given or not given. *Scott v. Wilson,* 396 S.W.2d 532 (Tex. Civ. App. 1965), *aff'd,* 412 S.W.2d 299 (Tex. 1967).

disclosure of all known material risks in a proposed operation or course of treatment except for those risks of which the patient is likely to know or (2) to prove the reasonableness of any lesser disclosure or the immateriality of the undisclosed risk.

(Footnotes omitted.) At a glance such a rule appears to remedy the fault of following strictly the malpractice approach. The plaintiff's onerous burden of establishing a standard of medical practice is eliminated and the so-called "conspiracy of silence" is pierced. However, the correlative of such a rule, if carried to its conclusion, could serve as the basis for a different claim against a physician in malpractice, *i.e.*, one for having told too much to the patient, contrary to good, sound medical practice, so that the procedure is refused or complications arise out of fear or other emotional distress, to his injury, even though the risk revealed is minimal.[9]

The second may be characterized by the case of *Berkey v. Anderson*, 1 Cal. App. 3d 790, 805, 82 Cal. Rptr. 67, 78 (1969) (2d Dist., Div. 5):

> We cannot agree that the matter of informed consent must be determined on the basis of medical testimony any more than that expert testimony of the standard practice is determinative in any other case involving a fiduciary relationship. We agree with appellant that a physician's duty to disclose is not governed by the standard practice of the physicians' community, but is a duty imposed by law which governs his conduct in the same manner as others in a similar fiduciary relationship. To hold otherwise would permit the medical profession to determine its own responsibilities . . .

This case, however, must be read in conjunction with *Dunlap v. Marine*, 242 Cal. App. 2d 162, 51 Cal. Rptr. 158 (1966) (2d Dist., Div. 1) and *Tangora v. Matanky*, 231 Cal. App. 2d 468, 42 Cal. Rptr. 348 (1964) (2d Dist., Div. 3) construing *Salgo v. Leland Stanford Jr. Univ. Bd. of Trus-*

---

[9] *See Ferrara v. Galluchio*, 5 N.Y.2d 16, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958) and *Furniss v. Fitchett*, [1958] N.Z.L.R. 398.

*tees,* 154 Cal. App. 2d 560, 317 P.2d 170, (1957) (1st Dist., Div. 1). As stated in *Salgo:*

A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Likewise the physician may not minimize the known dangers of a procedure or operation in order to induce his patient's consent. At the same time, the physician must place the welfare of his patient above all else and this very fact places him in a position in which he sometimes must choose between two alternative courses of action. One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; this may well result in alarming a patient who is already unduly apprehensive and who may as a result refuse to undertake surgery in which there is in fact minimal risk; it may also result in actually increasing the risks by reason of the physiological results of the apprehension itself. The other is to recognize that each patient presents a separate problem, that the patient's mental and emotional condition is important and in certain cases may be crucial, and that in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent. (*Hunt v. Bradshaw* (1955), 242 N.C. 517, [88 S.E.2d 762]; *cf. Simone v. Sabo* (1951), 37 Cal.2d 253, [231 P.2d 19]; *Schloendorff v. Society of New York Hospital* (1914), 211 N.Y. 125, [105 N.E. 92, 52 L.R.A. N.S. 505].)

Although *Salgo* is silent on the question of the need for expert medical testimony, *Tangora* and *Dunlap* both hold that the issue of informed consent turns on whether the physician was acting in conformity with recognized practices of physicians under similar circumstances. This conflict in the California Court of Appeals in interpreting *Salgo,* coupled with the fact there was expert medical testimony in *Berkey* as to the standard involved, should be considered in reading *Watkins v. Parpala, supra,* which states that *Salgo* represents the proposition that expert medical testimony is not necessary in an informed consent action in California.

We believe a valid distinction exists between the traditional theory of malpractice and the instant cause of action. The milieu which may surround a particular patient's reaction to a proposed procedure, coupled with a physician's personal rapport with that patient and his response to that patient's reaction is a highly personal relationship. That is why it has been designated as a fiduciary relationship. Such a personal relationship cannot be categorized within the same standard, for example, as the objective procedure to be used to remove a gallstone or an appendix.[10] In the latter case there exists objective standards of medical procedure which can be readily ascertained and placed into evidence, while in the former an attempt to establish an objective standard of disclosure is nothing more than a Procrustean machination employed for the sake of utility.[11]

■■ The law applicable to informed consent must balance the conflicting right of the patient and duty of the

---

[10]Myers, *Informed Consent in Medical Malpractice,* 55 Calif. L. Rev. 1396 (1967).

[11]75 Harv. L. Rev. 1445 (1962) at 1447 makes the following observation:

The . . . [strict and modified malpractice approaches are] unsatisfactory. In view of the number of variables involved, the need for disclosure must depend upon the particular facts of the case. The actual existence of a custom in these circumstances is highly unlikely; even if one did exist, it would necessarily be so general as to be of little value. Indeed, the present attitude of the medical profession seems to be that the amount of disclosure proper in each case is a discretionary matter. This being the case, *the testimony of experts as to whether disclosure was indicated must be based on what they themselves would have done, or on what they believe others should have done, rather than on the application of a standard agreed upon by the profession as a whole.* . . .

. . . The duty to warn should be based not on the doctors' practice but on the patients' needs; that is, the inquiry should be whether a reasonable man in the doctor's position and with his knowledge of the patient would have been justified in concluding with substantial certainty that the patient, if informed of this risk, would not have withdrawn his consent. Such a decision does not call for expertise significantly different from that usually attributed to court and jury, and the judgment appears to be one properly left within the traditional decisional process.

(Italics ours.)

The evidence in the instant case would bear out the italicized portion of this note.

doctor in an equitable fashion. The inviolability of the patient's body, which is firmly grounded in Anglo-American law,[12] must be a starting point. Thus, the physician, absent an emergency, must not only explain the nature and consequences of a procedure, but also describe material risks peculiar to the procedure which may reasonably be foreseeable.[13] In this framework, expert medical testimony to establish a standard of disclosure by the plaintiff becomes unnecessary. However, this does not prevent the physician from introducing evidence of such a standard, if in fact one exists; [14] nor does it eliminate the necessity for some medical testimony to establish what is a reasonably foreseeable risk.

The critical determination to be made is whether the consent was given with an understanding of the reasons for or the necessity of the proposed procedure, its nature, and the reasonably foreseeable risks pertaining thereto. We prefer to emphasize the patient's right to know, as contrasted with the physician's duty to disclose, leaving the explanation of a failure to disclose these matters, if any, to the physician. In so doing we recognize that patients may only hear that which they want to hear, or be oblivious to what they are being told, or after an adverse result may forget what they are told. Such are issues of credibility with which courts contend in their everyday operation. In

---

[12]Jacobsen, *Informed Consent in Illinois*, 18 DePaul L. Rev. 458 (1969).

[13]"Reasonably foreseeable" implies the likelihood that the danger or risks will materialize. Thus, the greater the frequency of injury, the greater the obligation of the physician to mention it. Plante, *An Analysis of "Informed Consent"*, 36 Fordham L. Rev. 638 (1968). A physician is *presumed* to have knowledge of inherent risks. Thus, a physician's claim that he was unaware of a reasonably foreseeable one is a futile defense.

Foreseeability, as determining the limits of a defendant's duty, is discussed in *Wells v. Vancouver*, 77 Wn.2d 800, 467 P.2d 292 (1970), *Rikstad v. Holmberg*, 76 Wn.2d 265, 456 P.2d 355 (1969), and *McLeod v. Grant County School Dist. 128*, 42 Wn.2d 316, 255 P.2d 360 (1953).

[14]The medical profession has been advised in various medical writings of the legal problems of informed consent. They are aware of its existence. See bibliography, Med. Trial Tech. Q. at 49 (Dec. 1969).

this respect we accept the comment in *Berkey v. Anderson, supra.*

However, we expressly refuse to adopt the position that because of the patient-physician relationship the physician has an obligation to detail *all* risks of a given procedure.[15]

If, at the time a physician discloses reasonably foreseeable risk, the patient inquires concerning any or all risks, then complete disclosure on the part of the physician is required. Correlatively, if the patient wishes to be informed of any risks beyond those reasonably foreseeable he has the duty of inquiry.[16]

Consequently we hold that a plaintiff, to establish a prima facie case when she was informed of the nature and purpose of the procedure, must allege and prove: (1) she was not informed of a reasonably foreseeable risk, *or* that she inquired of defendant as to any risks involved in the proposed procedure and was not informed of same; (2) if she had been informed, she would not have proceeded with the procedure; and (3) she has been injured as a result of submitting to the procedure.

■ In the instant case there is ample testimony to show that there are four risks in an esophagoscope examination: (a) reaction to the anesthetic, (b) cardiac arrest due to the anesthetic, (c) control of bleeding, and (d) perforation. All are minimal and the latter occurs in at most ¾ of 1 per cent (.75 per cent) of esophagoscopies. The surgical proce-

---

[15]The doctrine does not insist upon frenzied, full disclosure or any orgy of open mindedness. 32 Atl. L. J. 256 (1968). All reasonable people must understand that there is some risk inherent in surgery. *Shetter v. Rochelle,* 2 Ariz. App. 358, 409 P.2d 74 (1965) *modified,* 2 Ariz. App. 607, 411 P.2d 45 (1966).

[16]We are also cognizant that in a given circumstance a revelation of inherent risk may be medically unsound because of the patient's emotional make-up. In such a situation it is incumbent upon the physician to substantiate to the trier of fact's satisfaction the validity of his decision to withhold the required information. However, this defense as well as waiver of the right to know by a patient not desirous of hearing all of the possible risks, or a patient's implied consent by his submittal to the procedure, are not before the court at this time. *Cf.* Smith, *Therapeutic Privilege to Withhold Specific Diagnosis from Sick Patient with Serious or Fatal Illness,* 19 Tenn. L. Rev. 349 (1946).

dure involved has some risks, but it is not extremely hazardous nor are the risks inordinately great. The unfortunate result of perforation was almost an imperceptible risk. We find as a matter of law that the perforation here was not a reasonably foreseeable risk. Also, there is no evidence that plaintiff inquired of defendant as to any risks involved in the procedure, even though she had been told it was a reasonably safe procedure.[17] Plaintiff has failed to bring herself within either portion of part one and, consequently, has not established a case to warrant submission to jury. The trial court should have granted defendant's motion for directed verdict on this issue.

(D) *Sole Use of Physician's and Surgeon's Testimony to Establish Negligence.*

The last issue before this court concerns instruction No. 11:

> In determining whether Dr. Ellsworth exercised such reasonable and ordinary skill, care and diligence, as is exercised by members of the medical profession in good standing in the same line of practice, *you must be guided solely by the testimony of physicians and surgeons,* and the question of whether the defendant doctor, Dr. Ellsworth, was guilty of negligence, as charged, or exercised proper diligence and care, can only be established by the testimony of experts skilled in the medical profession.
>
> If the testimony of such experts does not establish lack of such ordinary care, skill and diligence on the part of the defendant, then there is a failure of proof that Dr. Ellsworth was negligent and your verdict should be for the defendant in this case.

(Italics ours.) We find the italicized portion to be contrary to the rule as set forth in *Douglas v. Bussabarger,* 73 Wn.2d 476, 481, 438 P.2d 829 (1968) which holds:

---

[17]A patient of average sophistication may be presumed to be aware of certain dangers inherent in a diagnostic procedure and thus may be deemed to have (at least impliedly) considered them in giving consent. 75 Harv. L. Rev. 1445 (1962). This is the rationale of *Watson v. Clutts,* 262 N.C. 153, 136 S.E.2d 617 (1964), heavily relied upon in *Watkins v. Parpala,* 2 Wn. App. 484, 469 P.2d 974 (1970).

[T]he need for expert medical testimony is limited to establishing the proper standard of care . . . Furthermore, . . . all the evidence [should be considered] in determining whether the defendant failed to meet that standard of care.

We realize that the instant case was decided prior to the announcement of the *Douglas* rule and believe the language in this instruction will not again be utilized.

Judgment of the trial court is reversed and the case remanded for new trial on the issue of defendant's negligence in performance of the esophagoscopic examination.

EVANS, C. J., and GREEN, J., concur.